Walkup Drayage & Warehouse Co. v. Commissioner. Merchants Express Corporation v. Commissioner.
Walkup Drayage & Warehouse Co. v. Commissioner
Docket Nos. 3271, 3272.
United States Tax Court
1945 Tax Ct. Memo LEXIS 147; 4 T.C.M. (CCH) 695; T.C.M. (RIA) 45241; June 25, 1945
*147 1. Taxpayer corporation was not availed of during 1940 for the purpose of preventing the imposition of surtax upon its sole stockholder and therefore is not liable for surtax under section 102, I.R.C.
2. Amount of deduction for solicitation of business and entertainment of customers determined. 3. Deduction of amount representing club dues paid by taxpayer for its president disallowed for lack of proof that it constituted an ordinary and necessary business expense. 4. Wife of taxpayers' president, his secretary prior to their marriage, accompanied her husband on a trip to New York, performing secretarial work and assisting in the entertainment of customers. Held, taxpayers entitled to deductions for expenses of her trip paid by them. 5. Deductions of amounts paid to wife of petitioners' president as reimbursement of entertainment expenses disallowed for lack of proof that they constituted ordinary and necessary business expenses. Bayley Kohlmeier, Esq., 300 Montgomery St., San Francisco 4, Calif., for the petitioners. Arthur L. Murray, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies for the year 1940 against Walkup Drayage & Warehouse Co. in income and declared value excess profits taxes in the respective amounts of $31,698.68 and $645.22; and a deficiency in income tax for the same year against Merchants Express Corporation in the amount of $509.80. The issues relating to Walkup Drayage & Warehouse Co. are: (1) Whether the corporation was availed of during 1940 for the purpose of preventing the imposition of surtax upon its stockholder and is, therefore, liable for surtax under the provisions of section 102 of the Internal Revenue Code; (2) Whether the corporation is entitled to a deduction of $8,135 incurred in the solicitation of business and entertainment of customers; (3) Whether the corporation is entitled to a deduction *149 as an ordinary and necessary business expense of the sum of $166.84 representing one month's dues to a country club on the membership of the corporation's president and sole stockholder; (4) Whether the cost of a trip to New York by the wife of the corporation's sole stockholder is deductible as an ordinary and necessary business expense; and (5) Whether an amount paid to the wife of the corporation's sole stockholder as reimbursement for the cost of entertaining customers is deductible by it as an ordinary and necessary business expense. The issues relating to Merchants Express Corporation are identical with issues (4) and (5) above. They arise solely because the expenditures and claimed deductions were divided equally between the two corporations. Findings of Fact Issue 1. The following facts were stipulated or admitted in the pleadings: The petitioner, Walkup Drayage & Warehouse Co., which, for convenience, will be referred to throughout as the petitioner, is a California corporation with its principal place of business in the City and County of San Francisco, California. Its income and declared value excess profits tax return for the year 1940 was filed with the collector *150 of internal revenue for the first district of California. The petitioner was organized in 1920 for the purpose of acquiring and operating the drayage and warehouse business then carried on in San Francisco as a sole proprietorship by Ward G. Walkup. One-third of the stock was issued to Ward G. Walkup in exchange for the drayage and warehouse business and the assets used therein. Two-thirds of the stock was issued to other parties for cash. In 1931 Walkup completed the purchase of all of the outstanding stock of the petitioner. At all times since its organization, the petitioner has actively engaged in the drayage and warehouse business in the city of San Francisco, California. The petitioner, Merchants Express Corporation, which, for convenience, will be referred to throughout as Merchants, was organized under the laws of California on August 24, 1934, for the purpose of acquiring and operating the express and drayage business of Merchants Express & Drayage Company, then in receivership. At the time of its organization, Merchants issued capital stock of a par value of $100,000. At all times since its organization, this company has actively engaged in the express, drayage and warehouse *151 business in the East Bay district, comprising the cities of Oakland, Alameda, Berkeley, and surrounding territory, all in the State of California. On August 1, 1935, the petitioner purchased all of the outstanding stock of Merchants for $74,000 cash. The original contract for the purchase of the stock was for a price of $110,000. After $28,000 had been paid thereon, the balance was settled for $46,000, making the total cost $74,000. The petitioner has owned all of Merchants' outstanding stock since August 1, 1935. Walkup Company, a corporation, was organized under the laws of California on April 10, 1937, for the purpose of acquiring and holding real property and improvements thereon. At the time of its organization, the company issued three shares of stock to Ward G. Walkup for $50 per share cash. Since its organization in 1937, Walkup Company has been engaged in the business of owning real property which it leased to others and leasing real property which it sub-leased to others. In 1935 the petitioner, pursuant to a permit granted by the Railroad Commission of California, issued and sold 850 shares of preferred stock of a par value of $100 per share, for $85,000 cash. A *152 sinking fund was created for the retirement of the preferred stock, the terms of which provided, in part, as follows: "On April 1, 1936, and quarterly thereafter, so long as any Preferred Stock remains outstanding, the corporation shall make available, out of such assets as are now, or may hereafter be, legally available therefor, a sinking fund to be applied to the purchase or redemption of Preferred Stock in an amount not less than Three Thousand Dollars ($3,000.00) and such sum shall be applied to the redemption within one (1) month after the first day of each of said quarterly periods of not less than thirty (30) shares of Preferred Stock determined by lot, together with accrued dividends thereon, if any. At all times during the year 1940 the stocks of the petitioner, Merchants and Walkup Company were owned as follows: Outstanding Stock
Ownership
Company
Shares
Par Value
Shares
Name
Petitioner
Common Stock
500
$ 50,000
500
W. G. Walkup
Preferred Stock
850
85,000
(550
Anglo Holding Co.
(300
Yellow Truck &
Coach Mfg. Co.
Merchants Express Corp. Com. Stock
10,000
$100,000
10,000
Petitioner
Walkup Company Com. Stock
3
None
3
W. G. Walkup
*153 On April 28, 1936, pursuant to a permit issued by the Railroad Commission of California, the petitioner and Merchants jointly borrowed $208,000 from Central Bank of Oakland and the Federal Reserve Bank of San Francisco. The loan agreement with the Federal Reserve Bank provided that the notes should be guaranteed unconditionally by Walkup. The agreement further provided that the corporations should purchase no capital assets, except equipment parts, and should pay no dividends on their common stock without having first obtained the written consent of the Federal Reserve Bank. The petitioner further agreed that it would not purchase or retire any of its preferred stock while the loan remained outstanding and at the same time received permission from the Railroad Commission of California to suspend the sinking fund requirements of the preferred stock until the loan of $208,000 was paid in full, or until April 1, 1941, whichever was the earlier. The loan of $208,000 was paid in full by the petitioner and Merchants in 1939. During 1940 and 1941 the petitioner borrowed money from the Central Bank in Oakland, as follows: Date
Borrowed
Payment
Balance
1940
January 8
$50,000.00
$ 50,000.00
April 6
$50,000.00
0
May 1
30,000.00
30,000.00
July 30
30,000.00
0
December 14
50,000.00
50,000.00
1941
July 19
50,000.00
100,000.00
August 6
50,000.00
50,000.00
August 21
50,000.00
100,000.00
*154 During the period from its organization in 1937 to December 31, 1940. Walkup Company made the following expenditures for the acquisition and improvement of property: (a) 1937 Purchased 240 Second Street,
San Francisco, at a cost of
$166,149.00
Made additions and improve-
ments to 240 Second Street
at a cost of
48,552.00
1937 total investments
$214,701.00
(b) 1938 Made additions and improve-
ments to 240 Second Street
at a cost of
67,448.00
(c) 1939 Made additions and improve-
ments to 240 Second Street
at a cost of
2,279.00
(d) 1940 Purchased Roebling Bldg. at
a cost of
174,018.45
The petitioner advanced money to, or for the use of, Walkup Company from time to time commencing April 12, 1937, and continuing through the year 1941. These advances were carried as an asset on the books of the petitioner and as a liability on the books of Walkup Company. The outstanding balance in the account on December 31 of each year from 1937 to 1941, inclusive, was as follows: 1937
$ 53,000.00
1938
63,000.00
1939
91,600.00
1940
131,600.00
1941
246,209.28 Interest at the rate of 5 per cent per annum has been regularly paid on the outstanding *155 balance in the account. Walkup Company made payments on its account with the petitioner to and including December 31, 1941, as follows: March 28, 1939
$16,000.00
December 17, 1940
3,882.91
December 30, 1941
50,000.00
During the period from 1937 to 1940, inclusive, Walkup Company incurred indebtedness as follows: In connection with the purchase in 1937 of the property at 240 Second Street, San Francisco, Walkup Company executed three notes, aggregating in amount $151,706, secured by first, second and third deeds of trust on the property. These loans were all obtained from persons and corporations other than the petitioner. In 1938 Walkup Company borrowed from the Central Bank in Oakland amounts aggregating $63,000, giving its notes therefor. In 1939 Walkup Company refinanced its indebtedness by borrowing from a San Francisco bank the sum of $200,000, giving its note therefor, with which it paid the balances due on its previously incurred obligations. The note was secured by a deed of trust of the property at 240 Second Street and the improvements thereon. In 1940 Walkup Company borrowed $287,000 from the San Francisco Bank in connection with the purchase *156 of the Roebling Building. Of this sum, $157,252.56 was applied in payment of the remaining balance on the $200,000 note and the remainder, together with $43,882.91, advanced by the petitioner, and $388.10 cash on hand of Walkup Company was used in the purchase of the Roebling Building. The $287,000 note was secured by a deed of trust of all the property of Walkup Company. The petitioner paid dividends on its common stock in the amount of $16,000 in each of the years 1926 and 1927. It paid dividends on its preferred stock of $4,722.19 in the year 1936 and of $4,250 in each of the years 1937, 1938, 1939, and 1940. From the date of its organization to and including December 31, 1940, Merchants paid dividends as follows: 1936
$ 2,000.00
1937
30,000.00
On March 31, 1940, Walkup Company paid a dividend in the amount of $7,500. During the year 1940 and prior thereto, Ward G. Walkup was personally indebted to the petitioner. The balance owing by him to the company on December 31 of each year from 1930 to 1940, inclusive, and the credit balance on December 31, 1941, were as follows: 1930
$ 2,400.00
1931
67,984.15
1932
63,320.76
1933
59,004.39
1934
63,832.71
1935
56,800.83
1936
47,468.85
1937
47,292.73
1938
31,809.08
1939
33.19
1940
149.96
1941 Credit Balance
$ 5,000.04
*157 On December 31, 1939, Walkup Company assumed $33,400 of the sum owed by Walkup to the petitioner and Walkup's account with Walkup Company was increased by that amount. Commencing in 1939 Walkup became indebted to Walkup Company. The amounts owing to the company on December 31 of the years 1939 to 1941, were as follows: 1939
$49,400.00
1940
42,571.05
1941
48,021.40
Interest was regularly charged on the indebtedness at the rate of 5 per cent per annum. During the year 1941 Walkup Company purchased property at 1301 Wood Street, Oakland, California, and made improvements thereon at a total cost of $287,852. The advances made by the petitioner to or on behalf of the Walkup Company during the year 1941 were for the purchase and improvement of 1301 Wood Street, Oakland, and for the improvement of the Roebling Building in San Francisco. On July 18, 1941, Walkup Company borrowed $100,000 from San Francisco Bank in connection with the purchase of property at 1301 Wood Street, Oakland. On December 9, 1941, Walkup Company refinanced its indebtedness to San Francisco Bank by borrowing $550,000. Of the $550,000, $343,500.31 was applied in payment of the unpaid balances *158 on the $287,000 note executed in 1940 and the $100,000 note executed on July 18, 1941. The balance of the money was used for the improvement of the property in Oakland. The $550,000 note was secured by trust deeds on all the property of Walkup Company. The record discloses the following additional facts: The petitioner has expanded greatly since the time of its organization and in 1940 the petitioner and Merchants were the largest organizations in their type of business in their respective localities. Ward G. Walkup has been president of the petitioner since the time of its incorporation, with the exception of a period from 1929 to 1931. During 1925, Walkup contracted to purchase the common shares of the corporation not then owned by him, committing himself and the petitioner that payment therefor would be made out of the earnings of the petitioner. In 1928 the petitioner obtained the accounts of the Southern Pacific Company and Hearst Publications upon the expectation that the bank would loan it the money with which to finance this increased business. The bank, however, refused to make the loan and the petitioner was forced to secure the necessary finances elsewhere on terms *159 which it was later unable to meet. In January 1929, a creditors' committee was formed to take over the operation of the petitioner's business and Walkup was removed as an officer and director. At that time the petitioner's indebtedness amounted to $249,000, consisting of both amounts borrowed in connection with the operation of its business and the balance due on the purchase of the stock by Walkup. During 1929, 1930 and 1931 the petitioner reduced the amount of its debt to $184,000 and in 1931 it borrowed an amount equal to the balance, or $65,000, which it used to complete the purchase of its stock by Walkup. Walkup thereupon gained control and management of the petitioner and this sum was charged to his account. Since 1931 Walkup has made payments in partial satisfaction of this account. In December 1939, $33,400 of the balance owed by Walkup to the petitioner was transferred to Walkup Company in exchange for that company's note of like amount. The transfer was made at the suggestion of the petitioner's secretary-treasurer and was done for the purpose of avoiding the setting forth of the account in statements made to the Railroad Commission. Walkup has continued to make payments *160 on this account to Walkup Company and has been charged interest on the outstanding balance at the rate of 5 per cent per annum. The petitioner purchased the stock of Merchants in 1935 at the suggestion of Southern Pacific Company, one of the petitioner's largest customers, since that company was dissatisfied by the service then being given by Merchants. Walkup became president of Merchants, which position he held in 1940. Since 1935 the officers of the petitioner have also served as officers of Merchants and the two companies have been operated in cooperation with each other. The business operated by Merchants in the East Bay district is similar to the business operated by the petitioner in San Francisco. In 1937 the petitioner was forced to vacate the premises then being used by it since that property was to be condemned for the San Francisco-oakland Bay Bridge. The petitioner was unable to lease suitable property. Its officers thought it would be impossible for the petitioner to purchase property in its own name since notice would have to be given to the Railroad Commission and it was feared that this would enable its creditors to acquire the property first. Consequently, Walkup *161 Company was organized for this purpose. Neither the petitioner nor Merchants owned any real property. In 1940 most of the property used by the two corporations was leased from Walkup Company. The income and expenses of the petitioner and Merchants for the year 1940, as shown by their respective Federal income and excess-profits tax returns for that year, were as follows: Petitioner
Merchants
Gross income from operations
$867,327.71
$595,248.37
Operating expenses
808,134.85
575,755.66
Net operating profit
$ 59,192.86
$ 19,492.71
Other income: Interest
6,804.10
Gain from sale of assets
22,669.61
6,897.51
Miscellaneous income
3,933.54
1,200.51
Total income
$ 92,600.11
$ 27,590.73
Other expenses
9,151.17
3,087.93
Net income before taxes
$ 83,448.94
$ 24,502.80
Income and excess profits tax
20,027.75
4,059.53
Net income after taxes
$ 63,421.19
$ 20,443.27
The assets and liabilities of the petitioner and of Merchants on December 31, 1939 and December 31, 1940, per books, were as follows: Petitioner
Merchant
Dec. 31
Dec. 31
Dec. 31
Dec. 31
ASSETS
1939
1940
1939
1940
Current
Cash - On deposit, on hand and in transit
$ 43,826
$101,890
$ 11,544
$ 8,922
Accounts Receivable
31,980
43,806
47,576
55,844
Less: Doubtful accounts
4,995
5,000
Net Accounts Receivable
31,980
43,806
42,581
50,844
Total Current Assets
$ 75,806
$145,696
$ 54,125
$ 59,766
Investments
Merchants Express Corporation Capital Stock
74,000
74,000
Current account
62,275
6,584
( 62,275)
( 6,584)
Walkup Company Notes Receivable
91,600
131,600
Vallejo, Napa & Calistoga Transport Co.
advances
10,625
Total Investments
$227,875
$222,809
($ 62,275)
($ 6,584)
Miscellaneous Assets
8,812
6,566
7,416
4,805
Equipment & Fixtures - cost
525,818
542,157
561,742
575,269
Less: Accrued depreciation
233,208
222,336
358,506
364,444
Net Book Value
$292,610
$319,821
$203,236
$210,925
Deferred Charges
5,816
4,495
4,667
5,302
Franchises
1
1
TOTAL ASSETS
$610,919
$699,387
$207,170
$274,215
LIABILITIES
Current
Notes Payable to Bank
$12,000
$ 50,000
Equipment notes - due succeeding year
89,570
91,824
$ 29,550
Total Notes Payable
$101,570
$141,824
$ 29,550
Accounts Payable: Trade Creditors, taxes, etc.
34,144
56,679
$ 34,947
$ 28,418
Total Current Liabilities
$135,714
$198,503
$ 34,947
$ 57,968
Long Term Indebtedness
Notes Payable to Bank
10,000
Equipment Notes
51,509
31,898
23,612
Total Long Term Indebtedness
$ 61,509
$ 31,898
$ 23,612
Reserve - For Claims
172
518
1,000
1,000
Net Worth
Capital Stock
Preferred - 5% Cumulative
85,000
85,000
Common
50,000
50,000
100,000
100,000
Total Capital Stock
$135,000
$135,000
$100,000
$100,000
Surplus
Donated - Treas. stock
25,000
25,000
Profit & Loss Surplus
278,524
333,468
46,223
66,635
Total Surplus
$278,524
$333,468
$ 71,223
$ 91,635
Total Net Worth
$413,524
$468,468
$171,223
$191,635
Total Liabilities and Net Worth
$610,919
$699,387
$207,170
$274,215
*162 In 1940 the petitioner needed from $100,000 to $150,000 cash to be used as operating capital in the operation of its business. The operating expenses of the petitioner and its subsidiary during the period from 1936 to 1943 were about $100,000 per month. In addition to its operating expenses, the petitioner was required to advance freight charges for customers in the amount of $50,000 to $75,000 per month. At the close of 1940 the petitioner's officers expected an increase in the business as a result of war activities and they anticipated that additional equipment would be needed to handle the business. They also expected that, because of the pending war conditions, the manufacture of equipment might be seriously curtailed and they, therefore, thought it wise to secure as much equipment as possible in 1941. At the close of 1940, Merchants was in nned of a new location. No suitable property was available for lease and negotiations were in progress for the purchase of property in Oakland. Neither Merchants nor Walkup Company was able to finance the purchase and it was known that the petitioner would be required to give financial assistance if the purchase was to be made. It was *163 known, too, that the petitioner would be required to commence retiring its preferred stock in 1941 and its officers feared that the petitioner might be required to redeem additional preferred stock at a cost of about $40,000. representing the amount the retirement of which had been suspended during the term of the loan of $208,000. In December 1940, the petitioner advanced $40,000 to Walkup Company in connection with the purchase of the Roebling Building for eventual use by the petitioner as a warehouse. The amount loaned was borrowed by the petitioner from Central Bank for that purpose, with the knowledge of the bank. In December 1940, the petitioner advanced $10,625 in connection with the organization of the Vallejo Napa & Calistoga Transport Company and the purchase by that company of a franchise to carry freight between San Francisco and the East Bay area and Napa Valley. As a result of the organization of this company and the operation of the franchise, the petitioner and Merchants had each secured contracts for pick-up and delivery service which they have been able to carry out at a profit. Of the money advanced, $10,000 was borrowed by the petitioner from Central Bank for *164 that purpose and with the knowledge of the bank. Walkup Company charged the petitioner and Merchants the same rentals it would have charged anyone else. No portion of the advance made by the petitioner to Walkup Company had been repaid at the date of the hearing. Ward G. Walkup reported as net income for Federal tax purposes for the year 1940 the sum of $23,640.71 as his share of community net income. During 1940 the earnings and profits of the petitioner were not allowed to accumulate beyond reasonable needs of the business. The petitioner was not availed of during 1940 for the purpose of preventing imposition of surtax upon its stockholder. Issue 2. The business of the petitioner and of Merchants is highly competitive. In order to secure and hold the business, it is frequently necessary to entertain customers. The entertainment of customers and prospective customers was a general practice among the petitioner's competitors and other concerns engaged in the same type of business. During the year 1940 the petitioner advanced $8,135 to Walkup for this purpose. Walkup kept no record of how or for what purpose this sum was spent. Walkup testified that he spent all the money *165 so advanced for the purpose of entertaining the petitioner's customers and prospective customers and that he spent additional amounts for this purpose out of his personal funds. He testified that practically every day he had with him at lunch officers of various corporations which were customers or prospective customers of the petitioner and that he frequently entertained such persons at dinner. He also testified that on frequent occasions during 1940 he entertained at the Exposition, then in progress in San Francisco. On its return for 1940 the petitioner claimed a deduction of the sum of $8,135 as an ordinary and necessary business expense. The respondent disallowed the amount claimed in its entirety. Issue 3. During 1940 Walkup was a member of the Menlo Circus Club, a country club. During that year he used the horses which he stabled at the club and the facilities of the club for the entertainment of the petitioner's customers. The petitioner paid $166.84, or one month's dues, charged to Walkup by the club. It claimed a deduction of this amount on its return, which the respondent disallowed. Issue 4. During the year 1940 Walkup made a trip to New York to call upon business *166 accounts. Mrs. Walkup was taken on the trip to act as her husband's secretary and to assist him in the entertainment of the customers. She devoted a large portion of her time during the trip to the performance of these services. The petitioner and Merchants each paid one-half of the expenses of Mr. and Mrs. Walkup on this trip and claimed the same as deductions. The respondent disallowed one-half of the deductions claimed, or $419.54, to each corporation on the ground that one-half of the expenses was paid for Mrs. Walkup and was not an ordinary and necessary business expense. Issue 5. During 1940 and prior thereto, Mr. and Mrs. Walkup entertained customers in their home in San Francisco and at their week-end place in Redwood City. Mrs. Walkup paid the cost of the food and the cost of help, except extra help, from her personal allowance. In 1940 she requested $5,000 to reimburse her for the expenditures she had made in 1940 and other years. The matter was settled by the payment to her of $2,000, one-half of which was paid by the petitioner and one-half by Merchants. The respondent disallowed the claimed deductions therefor. Opinion VAN FOSSAN, Judge: Issue 1. The question here *167 presented is whether or not the petitioner is liable for additional surtax under the provision of section 102 of the Internal Revenue Code. The respondent concedes that the petitioner was not formed for the purpose of preventing the imposition of surtax upon its shareholder and that it is not a mere holding or investment company. The issue is, therefore, limited to the question of whether or not the petitioner was availed of during the taxable year for the purpose of preventing the imposition of surtax upon its shareholder. The operation of the statute is dependent upon the purpose of the corporation, acting through its officers, to accumulate earnings and profits in order to prevent the imposition of surtax on its shareholders as the result of the distribution of such earnings in the form of dividends. Effects are not controlling, - it is the purpose which is all important. Cecil B. DeMille, 31 B.T.A. 1161. Although purpose or intent is a state of mind, it nevertheless constitutes a fact to be proved and found as are other facts. William C. DeMille Productions, Inc., 30 B.T.A. 826. By the terms of the section involved, the fact *168 that the earnings or profits of the corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation, by a clear preponderance of the evidence, proves to the contrary. We have found as a fact that the earnings and profits of the petitioner were not permitted to accumulate beyond the reasonable needs of the business. We shall briefly allude to some of the reasons which led us to our conclusion. The petitioner's history, since its organization, and especially in the years following 1928, shows a record of rapid growth and expansion. From small beginnings it had grown until it became the largest business of its kind in San Francisco. The petitioner had a constant need for capital to finance this increased business and it was frequently compelled to resort to banks for loans, since its own capital was insufficient for this purpose. Its profits were used to a large extent to repay these loans or were otherwise plowed back into the business. During the year in controversy the petitioner's surplus increased from $278,524 at December 31, 1939, to $333,468 at December 31, 1940, a *169 gain of $54,944. However, the officers of the petitioner expected a drain on that surplus in 1941 in excess of the normal needs of the business. Under the loan agreement of 1936, whereby the petitioner and Merchants jointly borrowed $208,000, the petitioner had been permitted to suspend the retirement of its preferred stock, which was required to be retired at the rate of $12,000 per year, until the loan was paid, but in any event not later than April 1, 1942. The loan was paid in 1939 but since the preferred stockholders did not demand redemption the petitioner's officers thought it would be wiser to conserve its assets, so no stock was redeemed at that time. The officers knew that the petitioner would be required to start redemption in April 1941, and they feared the preferred stockholders might demand redemption of that stock which should have been redeemed in 1939 and 1940. The officers also expected that as a result of war conditions the manufacture of equipment might be restricted. They, therefore, felt it would be advisable to purchase as much new equipment as they could secure. In 1941 both the petitioner and Merchants made large purchases of equipment. During the same year *170 the petitioner made no retirements of old equipment and the retirement of Merchants amounted to $1,599. The normal cash needs of the petitioner were substantial. During 1940 the petitioner had need of from $100,000 to $150,000 cash to be used as working capital. However, the petitioner's cash at the end of that year amounted to only $101,890 and the combined cash of the petitioner and Merchants amounted to $110,812. The total current assets of the petitioner at December 31, 1940, were $145,696 and those of Merchants $59,766. The current liabilities of the two corporations on the same date amounted to $198,503 and $57,968, respectively. There was testimony to the effect that it is a general rule in the business world that the current assets of a business should be at least two or two and one-half times its current liabilities. However, as can be seen from the above figures, the ratio of the petitioner's assets to its liabilities and also that of Merchants were well below this figure. The petitioner did not invest its surplus in any enterprises except those having a reasonable relation to its business. Its investment at the end of 1940 consisted of its stock investment in Merchants *171 and a current account with that company; notes receivable from Walkup Company; and the advance made for the Vallejo, Napa & Calistoga Transport Company. The respondent contends that the history of the petitioner shows that its earnings were being used by Walkup for his personal gain and in a manner which prevented the imposition of surtax upon it. As an instance supporting his contention, he points to the fact that during 1937 the petitioner loaned Walkup the sum of $5,600 with which he purchased two-thirds of the stock of a corporation called Belshaw Warehouse Company. We cannot give this transaction the significance which the respondent ascribes to it since the evidence shows that this amount was repaid during the same year, Walkup's account with the petitioner having been reduced during 1937. The respondent also points to the loans made by the petitioner to Walkup Company during 1937, 1938 and 1939, which he claims were made for the personal benefit of Walkup, who was the sole stockholder of Walkup Company, as well as that of the petitioner. The undisputed evidence shows, however, that the loans were made not for the purpose of a benefit to Walkup but rather to the petitioner. *172 Walkup Company was organized to meet the petitioner's need by acquiring property which the petitioner needed for its business but which it could not purchase directly. It was necessary for the petitioner to make the advances since Walkup Company did not have sufficient capital of its own and had no credit standing with the banks. Since its organization, Walkup Company has confined its activities to the ownership or leasing of property used or to be used by the petitioner and Merchants. The respondent contends that the advances made by the petitioner during the year before us, $40,000 to Walkup Company and $10,625 for the acquisition of Vallejo, Napa & Calistoga Transport Company, were not necessary for the petitioner's business but merely constituted a drawing off of the profits of the business to prevent the imposition of surtax upon its sole stockholder. This contention is not sustained by the evidence. On our opinion, both advances were reasonably connected with and were reasonably necessary to the petitioner's business. Furthermore, the advances in question were not made from the petitioner's surplus. The petitioner borrowed the money with which to make them. This was done *173 because the beneficiaries of the loans had no credit with the banks and could not have obtained the money themselves. The petitioner's cash position was not affected but remained as it was before. Essentially the transactions amounted to a loaning of the petitioner's credit to the two corporations. Cf. United States v. R. C. Tway Coal Sales Co., 75 Fed. (2d) 336. The respondent relies upon Medical Arts Hospital of Dallas v. Commissioner, 141 Fed. (2d) 404. However, the facts in that case differ materially from those before us. In that case there was no substantial connection between the taxpayer and the corporation to which it made the advances, whereas in the instant case, Walkup Company was organized to acquire property which was used by the petitioner in its business. In the Medical Arts case the amounts loaned came directly from the taxpayer's surplus. In the case before us, the petitioner was obliged to borrow the sums which it loaned. There was no showing that the taxpayer in the Medical Arts case would derive any benefits from the advances made by it. Here, on the other hand, the sums advanced by the petitioner were expected to benefit it directly *174 in the acquisition of property to be used by the petitioner as a warehouse and in the securing of further business. The facts in the Medical Arts case, supra, are so different from those before us that we do not consider it controlling in the present controversy. The respondent asserts that the petitioner could have borrowed money to pay a dividend and that "there is nothing unusual about a corporation borrowing cash from a bank for use in the making of a dividend distribution and then borrowing further for the needs of its business." The statute in question was not intended to force the distribution of earnings and profits necessary for the proper operation of the business but was intended only to prevent the accumulation of earnings and profits for the purpose of avoiding the imposition of surtax upon the shareholders. General Smelting Co., 4 T.C. 313. Upon a consideration of all the facts in the record, it is our opinion that the petitioner was not availed of during 1940 for the purpose of preventing imposition of surtax upon its shareholder. Issue 2. This issue involves the deductibility of the sum of $8,135 alleged to have been paid by the petitioner to *175 Walkup for the entertainment of customers and prospective customers. We have no doubt that petitioner advanced considerable sums of money to Walkup for the purpose of entertainment of customers, nor do we doubt that Walkup spent large sums for this purpose. The difficulty is that Walkup kept no records of how he spent the money. The respondent disallowed the entire amount. As stated in Cohan v. Commissioner, 39 Fed. (2d) 540, "absolute certainty in such matters is usually impossible and is not necessary." Following the formula laid down in the Cohan case that we should make as close an approximation as possible, bearing heavily on the taxpayer whose inexactitude is of his own making, we allow a deduction of $4000 on account of such item. Issue 3. This issue presents a different question from the previous one. We have no evidence except Walkup's statement that he estimated that one month's dues were properly allocable to business entertainment. We do not consider this sufficient to sustain the deduction claimed. Consequently, we approve the respondent's determination. Issue 4. The petitioners' president testified that his wife accompanied him on the trip to New *176 York to do secretarial work and to help in entertaining customers. It appears from the record that she had been his secretary prior to their marriage in 1932 and that his principal purpose in taking her along was to perform these duties. There is no question but that the amounts involved were actually expended. Under the circumstances, we think they constituted ordinary and necessary business expenses and that the deductions should, therefore, be allowed. Issue 5. The amounts paid to Mrs. Walkup as reimbursement for entertainment expenses cannot be allowed as deductions. She did not testify and no competent evidence was introduced to show how much was expended on behalf of the corporations and how much was for social entertainment or in what years the expenditures were made. From the meager evidence of record, we cannot say that the expenditures constituted ordinary and necessary business expenses. We, therefore, approve the respondent's determination. Decisions will be entered under Rule 50.