GENERAL SMELTING COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2795.   Promulgated November 15, 1944.

*Yale L. Schekter, Esq.*, for the petitioner.
*W. J. McFarland, Esq.*, for the respondent.

316

318

**OPINION.**

BLACK, *Judge: Issue 1.*—In each of the taxable years petitioner paid T. Lewis Thomas, chairman of its board of directors, $14,400. These payments were entered on the books of petitioner as administrative expenses and were deducted by petitioner on its income tax returns under "Salaries and Wages (not deducted elsewhere)." The Commissioner disallowed these deductions in their entirety and still insists on the correctness of the disallowance. The petitioner contends

that the amounts in question were paid to Thomas for a twofold purpose, namely, as a pension for the long and valuable services which he had rendered to petitioner in the past and as compensation for actual services which he continued to perform for petitioner as chairman of its board of directors after he retired as president.

The applicable law and regulations are printed in the margin.[1]

The evidence shows that when T. Lewis Thomas retired as petitioner's president in 1937 in order to make way for the selection of his son, Lowell S. Thomas, as president, he did not retire from the actual service of petitioner. His activities were considerably curtailed, but the testimony is to the effect that he continued to render very valuable services in an active capacity. He was long experienced in the business and continued to formulate the buying and selling policies of the company, which were its most important requirements. Also, he continued to keep in contact with the company's most important and valued customers and to assist in securing and retaining their business. John N. Pomeroy, who is vice president and treasurer of petitioner, testified that when Thomas retired as petitioner's president in 1937 it was agreed between him and the board of directors that he should continue as chairman of the board of directors and should receive $14,400 per annum, and that this agreed compensation was based on two things: (1) Services which Thomas had rendered the company during his 32 years of past service, and (2) services which he was to continue to actually render the company. In this agreement no allocation was made as to how much of the $14,400 should be regarded in the nature of a pension for past services and how much should be regarded as compensation for services actually to be rendered in the taxable years. We do not think any such allocation

---

[1] SEC. 23 [Rev. Act of 1938]. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) IN GENERAL.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

ART. 23 (a)-6 [Reg. 101]. *Compensation for personal services.*—Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. * * *

*   *   *   *   *   *   *

ART. 23 (a)-9. *Pensions—Compensation for injuries.*—Amounts paid by a taxpayer for pensions to retired employees or to their families or others dependent upon them, or on account of injuries received by employees, and lump-sum amounts paid or accrued as compensation for injuries, are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. When the amount of the salary of an officer or employee is paid for a limited period after his death to his widow or heirs, in recognition of the services rendered by the individual, such payments may be deducted. As to deductions for payments to employees' pension trusts, see section 23 (p).

[Provisions similar to the foregoing are found in Regulations 103, relating to the Internal Revenue Code, applicable to taxable years 1939 and 1940.]

is necessary under the Treasury regulations, provided the aggregate sum is reasonable. Cf. *Lucas* v. *Ox Fibre Brush Co.*, 281 U. S. 115. It needs no citation of authority to support the proposition that the part of the $14,400 which represented compensation paid to Thomas in the taxable years for services actually rendered to petitioner is deductible as an ordinary and necessary business expense, provided that it is reasonable.

Is so much of the $14,400 paid to Thomas in each of the taxable years as representing payments in the nature of a pension also deductible? Respondent in his brief cites and relies upon the sections of the statute and regulations which deal with the establishment by an employer of pension trusts and the deduction by the employer from his gross income of payments to such pension trust. We have no such question here and we have not quoted the sections of the statute and regulations which deal with pension trusts. Petitioner makes no claim that it has established any pension trust or contributed any amount thereto in either of the taxable years. It asks no deduction on that account. Petitioner relies upon article 23 (a)–9 of Regulations 101, printed in the margin, *supra*, and similar provisions of Regulations 103 applicable to the Internal Revenue Code. We think the provisions of this article of the regulations sustain petitioner.

Mertens Law of Federal Income Taxation, vol. 4, sec. 25.69, says in part:

§ 25.69. Pension Payments—General. Pensions are a customary form of additional compensation for services actually rendered. If claimed as deductions they must meet the tests commonly applied in determining the right to a deduction for salary or compensation. It is now settled generally, however, that amounts paid by a taxpayer for pensions to retired employees or to their families or others dependent upon them may be proper deductions as ordinary and necessary expenses. * * *

Pension payments are covered not only by the general provision permitting a deduction for ordinary and necessary business expenses, including salaries and compensation, but also by a special provision in the statute providing for deduction of amounts paid to pension trusts. * * *

Considering the length of Thomas' service to petitioner, many years of it being as petitioner's president and directing head, and also considering the volume of petitioner's business and the services which Thomas continued to render to petitioner, we think the payments made to Thomas were reasonable for past and present services and we have so found in our findings of fact. Such payments are deductible as ordinary and necessary business expenses. Cf. *Lucas* v. *Ox Fibre Brush Co.*, *supra; C. Wilderman Co.*, 8 B. T. A. 771.

In support of his action in disallowing petitioner a deduction in each of the taxable years of the $14,400 paid to Thomas, respondent strongly relies upon *Snyder & Berman, Inc.*, 41 B. T. A. 1180; affd.,

116 Fed. (2d) 165. We think that case is distinguishable on its facts. In *Snyder & Berman, Inc.*, in each of the taxable years ending January 31, 1936, 1937, and 1938 the taxpayer credited on the corporation books the sum of $2,400 per annum to the account of Gus Berman, a former officer and employee, who had suffered a nervous breakdown, and it used the amounts so credited to pay his personal expenses and to provide for the support and maintenance of his wife and child. The Board of Tax Appeals, in holding that these disbursements were not necessary or ordinary expenses in the conduct of the business of Snyder & Berman, Inc., based the opinion upon express findings of fact, viz:

\* \* \* It is undisputed that Gus Berman rendered no personal services to the petitioner during any of the taxable years which would entitle him to these salary credits, and evidence is lacking to establish that his personal services from December 1929 to July 1934 were of sufficient value to the corporation to merit the additional compensation of $2,400 claimed for each of the taxable years.

This was a finding (1) that Gus Berman rendered no services in fact during any of the taxable years, and (2) that Gus Berman was not shown to have rendered any services in the years prior to the taxable years of sufficient value to merit compensation in the taxable years, and the Circuit Court of Appeals affirmed the decision wholly upon these grounds.

We think it requires little discussion to point out that the facts of the instant case are entirely different from those which were present in *Snyder & Berman, Inc., supra.* Thomas, although 72 years of age at the time of his retirement as president, was in good health in each of the taxable years here involved and continued active in petitioner's services, although on a scale reduced somewhat from that which existed while he was president. Witnesses who were officers of competitive companies and had no connection whatever with petitioner testified that Thomas was well and favorably known to the trade and that the sort of services which it had been testified he continued to render to petitioner were of great value to any company which had the benefit of such services. On the strength of this testimony and other facts in the record, we sustain petitioner on issue 1.

*Issue 2.*—In determining section 102 surtax against petitioner for the taxable years 1939 and 1940, the Commissioner stated in his deficiency notice as follows:

The provisions of section 102 of the Internal Revenue Code are applicable because you, as a corporation, were availed of during the taxable years 1939 and 1940 for the purpose of preventing the imposition of surtax upon your shareholders through the medium of permitting earnings or profits to accumulate instead of being distributed.

It is the contention of the Commissioner that in each of the years 1939 and 1940 petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of the business. As we pointed out in

*Whitney Chain & Mfg. Co.*, 3 T. C. 1109, "By virtue of section 102 (c), the accumulation of earnings or profits beyond reasonable needs is determinative of a purpose to prevent the imposition of the surtax upon the shareholders, unless the corporation, by a clear preponderance of evidence, proves to the contrary."

The applicable sections of the statute and regulations are printed in the margin.[2]

The question which we have to decide under issue 2 is whether petitioner has proved by a clear preponderance of the evidence that the earnings and profits of its business during the taxable years 1939 and 1940 were not permitted to accumulate beyond the reasonable needs of the business, and that the purpose which prompted petitioner to accumulate its earnings and profits in these two taxable years instead of distributing them was to serve the reasonable needs of its business and not to prevent the imposition of the surtax upon its shareholders.

In deciding this issue several factors must be considered. Petitioner was an operating company and was engaged in a highly competitive business. Those in charge of its operations decided in 1938 upon a plan of modernization of its plant and equipment. Some land was purchased in 1938 to carry out this purpose and some more land was purchased in 1940 for the same purpose. At December 31, 1939, when the respondent contends that petitioner subjected itself to section 102 liability for failure to distribute its 1939 net income of $32,705.40, the petitioner had not only embarked upon its plan of modernization of its plant and equipment, but the Second World War had started in Europe on September 1, 1939, and it was clear that petitioner's business would expand by reason thereof. It would be required to carry larger inventories of raw material at increased prices and would be required to carry larger accounts receivable on its books.

For the year 1938 its sales volume had been $1,312,125.10 and for the year 1939 its sales volume had increased to $1,761,393.20; for 1940 it was $2,308,073.08; and for 1941 it was $2,666,341.63.

---

[2] SEC. 102 [I. R. C.].   SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

\*       \*       \*       \*       \*       \*       \*

(c) EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

SEC. 19.102–3 [Reg. 103].   *Unreasonable accumulation of profits.*—An accumulation of earnings or profits (including the undistributed earnings or profits of prior years) is unreasonable if it is not required for the purposes of the business, considering all the circumstances of the case. It is not intended, however, to prevent accumulations of surplus for the reasonable needs of the business if the purpose is not to prevent the imposition of the surtax. \* \* \* The nature of the investment of earnings or profits is immaterial if they are not in fact needed in the business. Among other things, the nature of the business, the financial condition of the corporation at the close of the taxable year. and the use of the undistributed earnings or profits will be considered in determining the reasonableness of the accumulations.

The petitioner, in retaining its earnings and profits for the years 1939 and 1940 instead of distributing them as dividends to its stockholders, not only considered its expanded volume of business due largely to the outbreak of the Second World War, but it also considered the cost of new buildings and equipment which its modernization program already embarked upon would entail. It is true that petitioner expended only $2,120 for these latter purposes in 1939 and $12,435.99 in 1940. But the plans had already been adopted and execution of them had started. In 1941 and 1942 $32,318.41 and $52,735.08, respectively, was expended for these purposes. And the testimony at the hearing was to the effect that this new building and equipment program calls for a still further expenditure of approximately $152,000.

In view of all these facts we do not think that the retention by petitioner in its business of its net earnings of $32,705.40 for 1939, thus making its total earned surplus December 31, 1939, $134,857.16, and of its net earnings of $51,546.38 for 1940, thus making its total earned surplus December 31, 1940, $186,403.54, was unreasonable.

It is doubtless true, of course, as respondent seems to argue, that petitioner could have paid out all of its earnings and profits for 1939 and 1940 in dividends to its stockholders and could have borrowed money to finance its modernization and expansion program. Petitioner did, in fact, borrow some money from the banks during the taxable years and discounted some of its notes to assist in financing its inventories of raw materials and accounts receivable. However, it borrowed no money to finance its modernization and expansion program.

But we do not understand that section 102 of the Internal Revenue Code and the regulations promulgated thereunder prevent a taxpayer corporation from making a reasonable accumulation of its earnings to finance expansion and modernization programs out of its own funds rather than to resort to borrowing for that purpose. The regulations themselves provide: "It is not intended, however, to prevent accumulations of surplus for the reasonable needs of the business if the purpose is not to prevent the imposition of the surtax." See sec. 19.102–3, Regulations 103, *supra*. We think that petitioner has proved by a clear preponderance of the evidence that its purpose in retaining its earnings and profits in the business in 1939 and 1940 instead of distributing them was not to prevent the imposition of the surtax on its stockholders, but to finance out of its own funds the expansion of its business following the outbreak of World War No. 2 in 1939 and the modernization program of its plant and equipment which it had embarked upon.

Unlike *Whitney Chain & Mfg. Co., supra*, petitioner had no outstanding loans to stockholders in either of the taxable years. Prior

to December 31, 1933, petitioner had loaned to its president, T. Lewis Thomas, $146,103.98 for his personal purposes. It is stipulated that in 1936 Thomas met with financial difficulties, whereupon his indebtedness to the petitioner was settled upon payment by him of $500 in cash to petitioner, and the balance of $145,788.39 was charged off its books by petitioner as a bad debt and this deduction was allowed by respondent. Just what the nature of Thomas' financial difficulties were we do not know. The stipulation does not inform us and there is no need that we should know, for there is no issue about them. In the taxable years 1939 and 1940 T. Lewis Thomas was not a stockholder of petitioner and, as we have already pointed out, none of petitioner's stockholders were indebted to it in any way.

Respondent makes an argument that the fact that petitioner paid out $32,390.61 in 1939 and $25,784.01 in 1940 as premiums and in payment of loans and interest against certain insurance policies on the life of T. Lewis Thomas, assigned by him to petitioner in 1936, shows that petitioner did not need all of its earned surplus for use in its business; that to invest in these insurance policies was unrelated and unnecessary to the operation of petitioner's business and is evidence of the prohibited purpose which the statute is designed to prevent. On this point respondent cites *Helvering* v. *Chicago Stock Yards Co.*, 318 U. S. 693. It is, of course, true that if petitioner in these two tax years had invested $58,174.62 in insurance policies which were wholly unrelated to petitioner's business there would be strong argument in favor of respondent's position. But we think the facts show that petitioner made its investment in these insurance policies in the exercise of sound business judgment. The facts show that petitioner is the assignee of these life insurance policies, subject to a prior pledge thereof to a bank, and that the moneys which it paid out in 1939 and 1940 were paid by it in good faith in an effort to obtain the ultimate equity in these policies for its own account in order to recoup the debt which T. Lewis Thomas owed to petitioner, for which he had in 1936 assigned these policies to the petitioner. The making of the original loans by petitioner to T. Lewis Thomas prior to 1933 was not for a business purpose. It is stipulated that the loans were made to Thomas as personal loans. However, while the loans were not made for business purposes, we think it was clearly a business purpose for petitioner to salvage as much as possible out of the loans when they became bad, and this it was endeavoring to do when it took the assignment of the insurance policies in 1936 and made payments on them in subsequent years, including the years 1939 and 1940, to protect them and keep them in force. The payments of the premiums on these policies in the years 1939 and 1940 and the payments of the loans and interest which stood against them increased the cash surrender value thereof,

stopped the 6 percent interest running against the loans to the extent they were paid; and increased petitioner's equity in the policies.

Under the circumstances which we have just narrated, we think that petitioner's expenditures in connection with these policies in 1939 and 1940 were related to its business, to wit, the preservation and conservation of its funds, and not a mere investment of its funds in an outside venture or an investment unrelated to its business. On issue 2 we sustain petitioner.

*Decision will be entered under Rule 50.*