A. H. Phillips, Inc. v. Commissioner.
A. H. Phillips, Inc. v. Commissioner
Docket No. 18914.
United States Tax Court
1951 Tax Ct. Memo LEXIS 67; 10 T.C.M. (CCH) 1007; T.C.M. (RIA) 51318; October 22, 1951
*67 Petitioner is a Massachusetts corporation which for many years has been engaged in the chain store grocery business in Springfield and surrounding territory. In 1940, because of competitive conditions it determined upon a policy of gradually converting most of its small stores into super markets and soon thereafter embarked upon that policy. The war came on and war conditions slowed down the progress of this program but, nevertheless, it continued and was in no sense abandoned. By the end of 1944, four such super markets had been established. Petitioner did not distribute to stockholders its 1943 and 1944 net earnings, after the payment of its income and excess profits tax. It retained and accumulated these earnings for the purpose of financing, without borrowing, its program of converting its small stores into super markets and the financing of larger inventories which this conversion and the end of the war would require. Held, during the taxable years 1943 and 1944, the earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of the business and petitioner was not availed of for the purpose of preventing the imposition of the surtax upon its *68 stockholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. The Commissioner is reversed. M. Manning Marcus, Esq., for the petitioner. Leo C. Duersten, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion Petitioner's income and excess profits tax liabilities for the taxable years 1943 and 1944, were as follows: Excess
Year
Income Tax
Profits Tax
1943
$30,976.55
$23,247.10
1944
21,884.21
1,041.35
The Commissioner has not determined any deficiencies in petitioner's income *69 tax and excess profits tax but he has determined that petitioner owes deficiencies in section 102 surtax, as follows: Year
Deficiency
1943 Surtax Section 102
$12,777.83
1944 Surtax Section 102
9,105.14
Total
$21,882.97
To this determination of the Commissioner the petitioner assigns error, as follows: "(a) Assertion that the provisions of Section 102, Internal Revenue Code, are applicable to undistributed profits of $52,284.23 for the year 1943, and to undistributed profits of $33,088.17 for the year 1944, on the allegation that the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting such amounts to accumulate beyond the reasonable needs of the business." Findings of Fact Many of the facts have been stipulated and we adopt these facts which have been stipulated as part of our findings of fact and incorporate them herein by reference. Petitioner, organized under the laws of the Commonwealth of Massachusetts on April 1, 1917, is a corporation with its principal place of business in Springfield, Massachusetts. Petitioner's corporation income *70 and declared value excess profits tax returns for the calendar years 1943 and 1944, were prepared on the accrual basis of accounting and filed with the Collector of Internal Revenue for the District of Massachusetts. Since the date of petitioner's incorporation and during the calendar years 1943 and 1944, petitioner has been engaged in the grocery business. Prior to April 1, 1917, the date of petitioner's incorporation, the business conducted by petitioner was owned and operated by Alvin H. Phillips as sole proprietor. Petitioner's capital stock consisted of 991 shares during the calendar years 1943 and 1944. Alvin H. Phillips, Mrs. Mary Phillips, wife of Alvin H. Phillips, and Mrs. A. L. Richards owned 989, one, and one shares, respectively, of petitioner's capital stock. Since the date of petitioner's incorporation, Alvin H. Phillips has been general manager, president, and treasurer of petitioner. Mrs. Mary Phillips and Mrs. A. L. Richards were clerk and vice president, respectively, of petitioner during the calendar years 1943 and 1944, and for the period prior thereto commencing in 1921. During the calendar years 1930 to 1944, inclusive, petitioner's net sales, income or loss, *71 inventories, accounts payable, and salary paid to Alvin H. Phillips were as follows: Income or
Inventories
Accounts Pay.
Salary
Year
Net Sales
(Loss) Reported
(End of Year)
(End of Year)
A. H. Phillips
1930
$3,969,613.25
$ 54,987.17
$584,724.74
$197,886.96
$24,193.56
1931
3,683,665.11
25,180.91
530,298.33
133,662.54
24,000.00
1932
3,094,361.19
17,344.36
526,271.44
115,279.08
24,000.00
1933
2,793,380.99
8,290.83
495,236.22
110,890.73
16,800.00
1934
2,671,051.60
4,478.13
457,425.90
97,605.73
16,800.00
1935
2,408,092.27
15,928.49
472,909.91
65,030.68
16,800.00
1936
2,115,087.67
(28,223.09)
404,795.76
39,423.17
16,800.00
1937
1,631,778.20
(20,679.02)
373,843.30
25,593.52
16,800.00
1938
1,314,157.52
(51,779.18)
329,133.30
18,062.15
16,800.00
1939
1,293,978.87
(10,099.89)
283,833.29
6,965.77
0.00
1940
1,370,785.59
( 1,217.61)
284,332.54
3,355.68
0.00
1941
1,515,608.31
20,078.62
300,600.08
5,657.08
0.00
1942
2,180,012.90
25,552.83
251,217.86
59,559.34
0.00
1943
2,061,356.10
103,918.03
228,263.54
48,053.47
0.00
1944
1,975,652.46
54,397.56
216,258.17
34,016.06
0.00
*72 As of December 31, 1942, 1943, and 1944, petitioner's assets, liabilities, capital, and surplus, as adjusted by the revenue agent, were as follows: December 31, 1942
Assets:
Cash
$162,584.95
Receivable
69,772.37
U.S. Obligations
15,000.00
State Obligations
9,075.00
Inventories
251,217.86
Land
53,604.67
Buildings
71,796.10
Furniture and Fixtures
86,765.16
Automobiles
4,662.00
Deferred Charges: Prepaid Insurance
751.80
Interest Accrued
83.32
Deposit on Meters
20.00
Goodwill
1,473.83
Total
$726,807.06
Liabilities and Capital: Accounts Payable
$ 56,092.83
A. H. Phillips a/c
3,466.51
Reserves: Capital Stock Tax
1,500.00
Federal Income Tax
22,149.68
Mass. State Excise Tax
2,876.02
Depreciation
102,438.53
Employees' Deposits on Surety
Bonds
2,000.00
Common Stock
99,100.00
Paid Surplus
37,000.00
Earned Surplus
400,183.49
Total
$726,807.06
December 31, 1943
Assets: Cash
$ 99,519.45
Receivables
69,562.86
U.S. Obligations
140,000.00
State Obligations
63,262.50
Inventories
228,263.54
Land
53,604.67
Buildings
71,796.10
Furniture & Fixtures
86,765.16
Automobiles
4,662.00
Deferred Charges: Prepaid Insurance
836.40
Interest Accrued
1,163.28
Goodwill
1,473.83
Total
$820,909.79
Liabilities & Capital: Accounts Payable
$ 40,101.57
A.H. Phillips a/c
7,951.90
Reserves: Capital Stock Tax
937.50
Federal Income Tax
78,760.91
Mass. State Excise Tax
5,197.28
Depreciation
109,510.93
Employees' Deposits on Surety
Bonds
1,600.00
Common Stock
99,100.00
Paid-in Surplus
37,000.00
Earned Surplus
440,749.70
Total
$820,909.79
December 31, 1944
Assets: Cash
$ 93,984.51
Receivables
83,423.85
U.S. Obligations
150,003.13
State Obligations
53,775.00
Inventories
216,258.17
Land
53,604.67
Buildings
71,796.10
Furniture & Fixtures
88,482.16
Automobiles
1,879.00
Deferred Charges: Prepaid Insurance
421.59
Deposit on Meters
10.00
Goodwill
1,473.83
Total
$815,112.01
Liabilities & Capital: Accounts Payable
$ 34,016.06
Reserves: Capital Stock Tax
500.00
Federal Income Tax
60,915.87
Mass. State Excise Tax
3,893.37
Depreciation
113,116.35
Common Stock
99,100.00
Paid-in Surplus
37,000.00
Earned Surplus
466,570.36
Total
$815,112.01
*73 The following schedule shows the net income and income tax liability of Alvin H. Phillips for the calendar years 1942, 1943, and 1944: Income Tax
Year
Net Income
Liability
1942
$42,498.99
$20,221.70
1943
37,818.57
24,765.90
1944
60,029.38
35,080.83
The following schedule shows the additional tax that would have been paid by petitioner's principal stockholder, Alvin H. Phillips, for the taxable years ended December 31, 1943 and December 31, 1944, if the profits of petitioner for the calendar years 1942, 1943, and 1944, after the payment of corporation income and excess profits taxes, had been distributed to Alvin H. Phillips, giving effect and consideration to the provisions of the Current Tax Payment Act of 1943: Additional
Year
Liability
Surtax
Calendar Year 1943
$59,312.63
$34,546.73
Calendar Year 1944
61,771.98
26,691.15
Since petitioner's incorporation, cash dividends have been declared and paid for the calendar years 1918 to 1921, inclusive, in the following amounts: Year
Cash Dividends
1918
$20,727.00
1919
19,924.60
1920
13,367.28
1921
1,007.83
Total
$55,026.71 For the calendar *74 years 1922 to 1944, inclusive, petitioner has made no dividend distribution of its earnings and profits to its shareholders. Petitioner's normal tax net income for the calendar years 1943 and 1944, was as follows: Year
Amount
1943
$103,271.50
1944
56,211.78
The following schedule shows, for the calendar years 1917 to 1944, inclusive, the yearly credits (or debits) to petitioner's earned surplus account and the balance thereof as of December 31, 1944, as reflected on its books and records: Year Ended
December 31
Credit
Balance
1917
$ 28,858.48
$ 28,858.48
1918
32,341.63
31,476.33
1919
19,204.64
31,676.37
1920
39,739.46
55,696.53
1921
59,472.47
109,621.44
1922
71,208.79
161,775.33
1923
13,652.59
102,479.71
1924
36,210.88
196,579.56
1925
26,027.41
214,089.30
1926
53,464.06
256,297.29
1927
34,058.87
276,716.01
1928
119,274.39
390,848.10
1929
68,852.54
460,988.53
1930
54,987.17
506,582.10
1931
27,502.87
524,533.31
1932
19,410.34
539,176.39
1933
9,846.64
551,975.56
1934
5,828.22
554,648.12
1935
18,236.10
607,433.07 A
1936
(25,907.12) *
579,688.67
1937
(20,679.02) *
522,172.38
1938
(51,779.18) *
470,393.20
1939
(10,099.89) *
460,293.31
1940
( 1,217.61) *
467,607.66
1941
20,078.62
490,471.82
1942
25,471.82
511,479.49
1943
103,918.03
609,336.78
1944
54,510.06
632,474.61
*75 Alvin H. Phillips, Sr., then 80 years old, was unable to appear to testify at the trial or, in recent prior months, to have his deposition taken, because of his physical and mental condition, having been confined in the Wesson Memorial Hospital, Springfield, Massachusetts. [The Court has been informed that Mr. Phillips died soon after the hearings in this proceeding were held.] Alvin H. Phillips, Jr., his oldest son, had been performing duties in connection with every phase of the business for the past 25 years. When his father was present, he worked with him and saw that his wishes and ideas and plans with respect to petitioner's business were carried out; when his father was absent, he was in command. The business of a retail grocery chain is the buying of food commodities, and selling them to the public. It is highly competitive. Advantageous quantity buying is essential. Phillips, Sr., was a pioneer in the chain store grocery business, beginning in 1900 with one store and building the business up to 191 retail outlets at one time prior *76 to the change-over to larger stores. Each store back in the 1900's and up to the early 1930's was just large enough in the sale of dry groceries only to permit one-man operation. As conditions and buying habits changed, petitioner got into two-man stores which included a meat department requiring two managers; and the volume of such stores increased from $250 to $500, to possibly $1,000 or $1,200 a week. Later the buying and selling habits again changed and super markets developed with grocery, meat, and bakery departments doing a much larger volume of business than the one- and two-man stores had done. Petitioner operates within a radius of 20 miles from Springfield, Massachusetts, a trading area of nearly 500,000 population, having as competitors Atlantic and Pacific Tea Company, First National Stores, Stop and Shop, Growers Outlet, New England Stores, and all independents. Petitioner had 36 stores in operation in 1943, and 34 in 1944, four of the latter being super markets and the rest two-man stores, except a few old line one-man stores. Petitioner did not have directors' meetings because Phillips, Sr., was president and treasurer and informally conducted petitioner's affairs, *77 conveying his wishes to Phillips, Jr., as his right-hand man, who had known his policies regarding operation of petitioner's business ever since he began to work for petitioner. No records were kept in the minute book concerning policies or plans as such matters were communicated verbally from Phillips Sr., to Phillips, Jr., and discussed by them frequently. Petitioner's policy and plans in 1940 were to convert its method of operation to the super-market mode of merchandising because its competitors were beginning to work along those lines, one or two competitors having already established super markets, and it was realized that to be successfully competitive petitioner had to open up super markets and gradually close the smaller stores. Concretely, petitioner determined on a program which comprehended opening at least as many as 12 super markets in the territory in which it operated. These were to be installed and operated as time and opportunity would permit. The super market was necessitated by the demands of the public which preferred to patronize a larger store where it could purchase all food requirements under one roof - make the one stop, complete the marketing in one operation. *78 Petitioner opened up its first super market in 1940 in Springfield, Massachusetts, another in 1941 in Springfield, another in 1942 in West Springfield, and another in 1944 on Boston Road, Springfield, thus having four super markets in operation at the end of 1944. The program comprehended placing other new super markets each year into operation on sites owned and improved by Phillips, Sr., until eventually the plan of establishing at least 12 super markets was carried out. Petitioner was closing its smaller units and channeling their business into the super markets, but ran into difficulties during the war period due to abnormal conditions beyond its control and was not able to proceed in full accordance with its plans. There were shortages of manpower and building materials, land values boomed, labor costs were high and there were numerous strikes. In 1943 and 1944, the two taxable years which we have before us, petitioner had not altered its plans for opening super markets and was determined to go through with its complete program. In 1945, it made efforts to carry its program on further, but because of still existing priorities steel could not be obtained for the construction *79 of stores. In 1946, there seemed to be a slight easing of building supplies, enough steel was obtained for one super market, and petitioner proceeded to open a super market in 1947 at 65 St. James Boulevard, Springfield, feeling that there was not going to be any letup in labor costs and public demand for super markets being even greater. After opening at that location, petitioner went ahead with another super market on Maple Street, East Longmeadow, which was opened in the Fall of 1947. At the time of the trial herein, petitioner had completed the construction of still another super market on Columbus Avenue in Springfield. Petitioner paid $100,000 for the land and $74,000 to build the store for the super market on Columbus Avenue, the construction of which was begun in June 1949 and completed in the Spring of 1950, making a total of $174,000 paid by petitioner for that project. In May 1950, petitioner, acting through Phillips, Sr., leased a part of such project to Growers Outlet, a rival chain store company. At that time Mr. Phillips' physical and mental health was in rapid decline and he thought it best for petitioner to lease the building and equipment to others rather than to *80 operate it itself. In opening super markets, petitioner planned to confine itself to sites already owned by it or by Phillips, Sr., or upon which it could obtain long-term leases. At the time in 1940 when petitioner entered into its plan of gradually converting into super markets, Phillips, Sr., in fact already owned the 12 sites which were later selected and which were choice locations in Springfield and vicinity. Petitioner never borrowed any money which was in accordance with its policy as directed by Phillips, Sr., of always having the corporation independent of outside sources for cash outlays and of never being dependent on bankers or others to expand its growing business, and not to depend on stock issues or other outside financing. Although petitioner sustained substantial losses ($111,998.79) for the five consecutive years beginning in 1936, it nevertheless did not have to borrow or raise additional capital. Its earned surplus was more than sufficient to absorb the losses which it suffered. In 1943 and 1944, petitioner had an abnormal turnover in inventory because of merchandise shortages and the rush by the public for scarce foodstuffs. The inventory of $228,263.54 *81 on December 31, 1943, was abnormally low by at least $115,000. On December 31, 1944, the inventory was $216,258.17 which was also abnormally low by about the same amount as for December 31, 1943. In 1943, net sales were shown as $2,061,356.10 and inventory of $228,263.54, making a turnover of about 9 1/2 times annually as against a normal turnover of about 4 1/2 times. Net sales for 1944 were $1,975,652.46 which, compared to inventory of $216,258.17, also represented an abnormal turnover. Petitioner's operating expenses, other than cost of goods sold, as reflected by its tax returns amounted to $283,858 for 1943, and $307,613 for 1944. Petitioner needed between $90,000 and $100,000 for free cash working capital in each of the years 1943 and 1944, in addition to all other funds. Petitioner needed this to make advantageous purchases of merchandise when the opportunity arose for it to do so. In 1942, petitioner's United States bond account was $15,000, rising to $140,000 in 1943, and to $150,000 in 1944, such increase being due to the drives to buy United States war bonds, while state bonds went from $9,075 in 1942 to $63,000 in 1943, then dropping in 1944 to $53,775. Also at that *82 time petitioner had surplus cash due to rapid turnover of inventory. Sound business management required that such funds should not remain idle for any length of time but should earn interest until it was necessary to convert such securities into cash for use in the business. Petitioner owned no stocks or bonds in other outside concerns and had no loans to stockholders. In 1943 and 1944, petitioner employed about 200 persons in its various stores and super markets. Petitioner's surplus balance as of December 31, 1942, December 31, 1943, and December 31, 1944, as reflected by its books and records was $511,479.49, $609,386.78, and $632,474.61, respectively. The Commissioner has determined that petitioner had undistributed profits of $52,284.23 for the year 1943, and of $33,088.17 for the year 1944. During the taxable years 1943 and 1944, the earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of the business and petitioner was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate, instead of being divided or distributed. *83 Opinion BLACK, Judge: The only question in this proceeding is whether petitioner for the years 1943 and 1944, is subject to the surtax under section 102 of the Internal Revenue Code, the pertinent provisions of which are printed in the margin. [1]
*84 Petitioner was an operating chain grocery business and had been for many years, and it is conceded that petitioner was not "formed" for the prohibited purpose, but respondent has determined and still contends that petitioner was "availed of" in 1944 for that purpose. Section 102(c) provided that an accumulation of earnings or profits beyond the reasonable needs of the business is determinative of the purpose to avoid surtax upon shareholders unless petitioner, by the clear preponderance of the evidence, proves to the contrary. Petitioner contends that its accumulated earnings were reasonably, properly, and prudently retained and the retention of its earnings was not for the prohibited purpose. What the reasonable needs of petitioner's business were in 1943 and 1944, and whether petitioner was "availed of" for the prohibited purpose are questions of fact to be determined from all the evidence. Helvering v. National Grocery Co., 304 U.S. 282; Helvering v. Chicago Stockyards Company, 318 U.S. 693; Cecil B. deMille Productions, Inc., 31 B.T.A. 1161, affirmed 90 Fed. (2d) 12, certiorari denied 302 U.S. 713. Petitioner *85 contends that its earnings and profits for the years 1943 and 1944, after the payment of all of its taxes which were considerable, were reasonably, properly, and prudently retained for the following purposes (a) To provide funds for the conversion and expansion of its stores into super-markets; (b) To provide funds to withstand possible future operating losses; (c) To provide funds for the replacement of depreciated assets; (d) To provide funds for adequate inventories; (e) To provide adequate cash working capital; (f) To maintain substantial cash balances for advantageous quantity purchasing; (g) To provide substantial cash reserves for Federal income, excess profits, and other taxes; and (h) To provide funds to defend litigation, and to meet claims. We shall not discuss nor undertake to decide all of these claims by petitioner. Respondent argues that none of them are well founded. With this we do not agree. We think petitioner has proved by a clear preponderance of evidence that its earnings and profits were reasonably, properly, and prudently retained for the accomplishment of at least some of the purposes enumerated above and that the failure to distribute these *86 earnings as dividends was not done for the purpose of preventing the imposition of the surtax upon its shareholders. Some of these purposes which we think petitioner has established by a clear preponderance of the evidence are: (a) To provide funds for the conversion of its one- and two-man stores into super markets. The facts with reference to this planned conversion have been stated in our Findings of Fact and need not be repeated here. It is sufficient to say that the installation of super markets required purchase of new fixtures, the carrying of larger inventories, and the paying of greater rents. It is true that petitioner did not have to furnish the money for the construction of buildings or the buying of land. This was done by Phillips, Sr., out of his own personal funds. He owned the land where in most instances the super markets were constructed and established. However, the evidence shows that in the case of the last one which was constructed prior to the hearing in this proceeding, namely, the one on Columbus Avenue, Springfield, Massachusetts, petitioner purchased the land and constructed the building at a cost of $174,000 for land, building, equipment, etc. Although *87 petitioner planned to install one of its super markets on this location when construction of it began, this was not done on account of the failing mental and physical health of Phillips, Sr., and it was thought best to rent it to another business enterprise. Petitioner has proved clearly that the establishment of these super markets would require considerable sums of money and it was petitioner's plan and purpose to furnish these sums of money out of its own funds and not by borrowings from banks or by the sale of stock to outsiders. This was a reasonable purpose and we so hold. General Smelting Co., 4 T.C. 313; Coca-Cola Bottling Works v. United States, 53 Fed. Supp. 992; Lion Clothing Co., 8 T.C. 1181; and J. L. Goodman Furniture Co., 11 T.C. 530. (b) Petitioner's earnings for the years 1943 and 1944 were reasonably, properly, and prudently retained to provide funds necessary for the carrying of an inventory adequate to meet its normal as well as expansion requirements. On December 31, 1943, petitioner's inventory was $228,263.54, and on December 31, 1944, was $216,258.17. These inventories were lower than normal to the extent *88 of at least $100,000 for each of the years in question. We are convinced that this is true from the evidence. The low state of the inventories was due to war conditions. Merchandise was scarce and when obtained was turned over fast. If petitioner had been able to open super markets in 1943 and 1944 in full accord with its program, it is obvious that its inventory requirements would have been substantially greater but no estimate of the same was offered in evidence in view of the uncertainties and contingencies produced by the war. Petitioner's ability to turn over its inventories as frequently as it did was due to abnormal conditions and explains largely the fact of its liquid position in the years 1943 and 1944, all of which emphasize the abnormalities existing in the war years. In J. L. Goodman Furniture Co., supra, the Court held that the taxpayer's inventories for 1942 and 1943 were low because of war conditions, and that part of its cash surplus over $800,000 would be necessary for the carrying of normal inventories after the war, and further that the use of estimates as to the amounts necessary for normal inventories was justified, the pertinent portion of the *89 Court's holding being as follows: "Goodman believed in 1942 and 1943 that the petitioner would enjoy a tremendous boom in sales after the war if it could survive the war. He was convinced of this because new furniture was so scarce during the war and because returning servicemen would be establishing many new homes for which furniture would be needed. Subsequent events proved that that opinion was well founded. He estimated in 1942 and 1943 that the petitioner would need funds for larger inventories and for the extension of credit in connection with this anticipated postwar business, as well as additional operating cash, in an amount about equal to the total capital and surplus in 1942 and 1943. It is not necessary to decide whether or not his estimates for this purpose were fully justified, since his estimates were honest, and substantial amounts of capital would be necessary and were necessary when the boom developed. * * *" Respondent argues that the Goodman case, supra, is not applicable here because the J. L. Goodman Furniture Co. was in the installment furniture sale business. While this does make a difference because the characters of the two businesses are different, nevertheless *90 we do not think it makes a distinction in principle. Petitioner has satisfied us that its inventories were lower than usual in 1943 and 1944, and that much larger inventories would need to be carried when the war was over and more goods were available and petitioner had carried out its plan, to some extent at least, in the establishment of super markets. (c) Petitioner's earnings were reasonably, properly, and prudently retained to maintain substantial cash balances for advantageous quantity purchasing. Petitioner was in direct competition with large and active competitors, such as Atlantic and Pacific Tea Company, First National Stores, Stop and Shop, Growers Outlet, New England Stores, and various independents, all of which commanded large amounts of capital resources. In order to be able to compete successfully with them it was vitally essential that petitioner should have a strong cash position. This could only be accomplished by maintaining substantial cash balances and preserving a high degree of liquidity. Petitioner did this in each of the years 1943 and 1944. This course of action, it seems to us, was wise and prudent. Because of the foregoing reasons we conclude that *91 petitioner was not availed of in either of the taxable years 1943 or 1944 for the purpose of preventing the imposition of the surtax upon the shareholders through the medium of permitting its earnings or profits to accumulate instead of being distributed. We, therefore, hold that the Commissioner erred in his imposition of the surtax on petitioner under section 102, I.R.C. for each of the years 1943 and 1944. Decision will be entered for the petitioner. Footnotes
A. (The balance as of December 31, 1935 reflects a credit of $37,000 paid-in surplus.) ↩
*. (Debits to account reflecting loss.)↩
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: * * *
(b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩