Kimbell Milling Company v. Commissioner.
Kimbell Milling Co. v. Commissioner
Docket No. 24179.
United States Tax Court
1952 Tax Ct. Memo LEXIS 301; 11 T.C.M. (CCH) 219; T.C.M. (RIA) 52061; March 7, 1952
R. B. Cannon, Esq., 913 Sinclair Bldg., Fort Worth 2, Tex., Harry C. Weeks, Esq., and Benjamin L. Bird, Esq., for the petitioner. John W. Alexander, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Deficiencies in income tax were determined by the respondent for the fiscal years ended May 31, 1945, to May 31, 1948, as follows: Fiscal
Year
Deficiency
1945
$ 64,370.98
1946
61,724.65
1947
250,663.43
1948
125,792.67
The only issue for our determination is the applicability *302 of the provisions of section 102, Internal Revenue Code, to petitioner corporation. Findings of Fact Petitioner was incorporated under the laws of Texas in June, 1917, by B. B. Kimbell, Kay Kimbell and W. L. Newsom as incorporators. The returns for the fiscal years involved were filed with the collector of internal revenue for the second district of Texas, at Dallas. The principal place of business for the tax years 1945 through 1948 was Fort Worth, Texas. The articles of incorporation established that the "capital stock of the corporation shall be One Hundred Thousand Dollars, to be divided into 1,000 shares of $100 each." Throughout the years in question petitioner reported on its annual balance sheets: "Capital Stock - Common ($200,000.00 Paidin; Balance from Earnings) $2,500,000.00". The articles of incorporation provide that petitioner was: "* * * formed for the purpose of purchasing, maintaining and operating mills and grain elevators, and, by means thereof, to purchase and sell grains and cereals of every kind and to manufacture, buy and sell flour and other food articles manufactured from grain or cereals, and purchasing and maintaining public *303 warehouses for the storage of products and commodities, and purchasing, selling and storing of products and commodities by grain elevators and public warehouses." Petitioner ceased milling operations in 1929, and since that date has been engaged in the grain elevator and storage business, and the processing of poultry and dairy feeds, and also in the wholesale grocery business. B. B. Kimbell, the father of Kay Kimbell, died in 1922; since 1922 the entire capital stock of petitioner has been owned by Kay Kimbell. Kay Kimbell received an annual salary of $50,000 for each year in question. Petitioner has shown a substantial profit for each year of its existence, but has never paid any dividends in cash or property. Among the assets owned by petitioner in the taxable years 1945 through 1948, and which comprise the securities account, are shares of stock in the Kimbell-Diamond Milling Company, Kimbell Elevators Company, Seguin Milling Company, Associated Employers Loyds, Fort Worth Grain & Cotton Exchange, and the Chicago Board of Trade. The cost basis of these interests to petitioner was $374,345, but the book value of these interests in May, 1948, had appreciated to $1,465,726. [1] *304 However, these assets were not considered quick or worthwhile assets by the commercial paper brokers in determining petitioner's credit rating. In March, 1945, petitioner purchased the entire stock of the Walker-Smith Wholesale Grocery Company (hereinafter sometimes referred to as Walker-Smith). This was a cash purchase of approximately $2,300,000. Walker-Smith was a wholesale grocery concern with annual sales of approximately $12,000,000. This company did business through some sixteen distribution centers located throughout central and west Texas, and was the exclusive distributor of certain name brands. Shortly after the purchase, petitioner liquidated Walker-Smith and utilized the established Walker-Smith distribution centers for its own products. However, prior to the actual liquidation of Walker-Smith petitioner sold to several small corporations owned by Kay Kimbell nine of the distribution centers. Petitioner set up open accounts receivable for the sale price of these centers in the amount of the book value of the inventories and fixtures. In some instances the sale price was $70,000 *305 or more and petitioner then set up the entire sales price in open accounts receivable. Many of these purchasing companies were recently organized by Kay Kimbell with a paid-in capital of $1,000; these corporations did pay the complete sales price shortly after the completion of the sale. In taking over Walker-Smith, petitioner extensively expanded its wholesale grocery business. The increased sales in the grocery department of petitioner is indicated below: GROCERY DEPARTMENT
Volume and Profits
Before acquisition of Walker-Smith
Fiscal
Year Ended
Sales
Profit
5/31/44
$ 545,846
$ 22,299
5/31/45
449,132
10,765
After acquisition of Walker-Smith
5/31/46 (part year)
$ 705,691
$ 31,767
5/31/47
7,269,881
260,217
5/31/48
8,968,899
244,148
Subsequent to the acquisition of Walker-Smith, petitioner purchased the Tasty Foods Products Company which was in the business of canning fresh vegetables. Later a second canning company was purchased. Petitioner has always demonstrated an aggressive business attitude. In about 1924 it built a modern plant for the shelling of maize. At this time there were no field threshers or combines capable *306 of threshing maize heads in the field. After three or four years such a combine was invented; central plants were therefore no longer practical. Rather than abandon its investment, petitioner began shelling Spanish peanuts. Through natural evolution peanut butter manufacturing machinery was installed, and now petitioner operates a very fine peanut butter plant. Originally petitioner's place of business was Wolfe City, Texas, where it owned a grain mill. But in 1924, with the growth of the business, petitioner moved its main office to Fort Woth. In Frort Worth it operated a large grain storage elevator, a building for its offices, a feed mill, and a large warehouse. Petitioner, through its grain departments, as distinguished from the wholesale grocery department, owned approximately 100, and operated between 130 and 135, country elevators of the type known as trackside elevators. The capacity of each of these country elevators varied between 10,000 and 25,000 bushels. The Fort Worth storage elevator originally had a capacity of 500,000 bushels, but prior to June 1, 1944, its capacity had been increased to 4,000,000 bushels. During the tax years in question the capacity of the country *307 elevators was increased from 2,586,900 bushels in 1944 to 3,628,220 bushels in 1948. Box cars must be utilized to transfer the wheat from the country elevators to the storage elevators at Fort Worth. Each country elevator handles many times its capacity during a season. During the past years petitioner's competition has continually grown. The Federal Government, in the tax years 1945-1948, made special efforts to encourage additional wheat production. With an increase in wheat production, there was also a greater demand for storage facilities. This increased production made it possible for new companies to participate in the grain business in direct competition to petitioner. To maintain its relative economic position petitioner improved its facilities and reinvested its earnings in the business. The grain business is highly hazardous and speculative due to the wide and sudden fluctuation of the market. Because of this fact, petitioner was required to maintain a large capital. Because petitioner reships wheat from the country elevators to its storage elevators, it must maintain a financial reserve sufficient either to pay cash for the grain, or to lend the farmers 80 per cent *308 of its value. Petitioner is in the position of a banker receiving demand deposits and must maintain a reserve of liquid assets to meet these demands. From its initial incorporation it met these demands with borrowed money. Petitioner's position as a borrower throughout the fiscal years ended May 31, 1945, to May 31, 1948, may be summarized as follows: Outstanding
Fiscal Year
at peak of
Outstanding
Ended
borrowing
at close
May 31, 1945
$4,201,812
$ 986,212
May 31, 1946
4,048,712
2,286,212
May 31, 1947
5,436,212
1,100,000
May 31, 1948
5,150,000
1,100.000
Petitioner's financing was accomplished through an open line of credit. Part of the financing was effected through commercial note brokers and part through banks. When actively engaged in borrowing from banks, it was required to maintain a minimum deposit in the lending bank (non-interest bearing) of 20 per cent of its total debt to that particular bank. When the line of credit was inactive petitioner was required to keep on deposit a minimum of 10 per cent of its authorized loan limit. It did the bulk of its financing through commercial note brokers because the effective interest rate was less *309 by this method. Petitioner, while a debtor for its own loans, was also a creditor for others. A comparison of petitioner's interest transactions indicates that more interest was received in the tax years in question than was paid out: Interest Income
Interest Paid
Received from
Paid to
Year Ended
Kay Kimbell
Kay Kimbell
May 31
Enterprises
Total *
Enterprises
Total *
1945
$52,087
$57,458
$ 1,245
$40,200
1946
57,975
66,235
525
41,788
1947
58,981
63,982
3,000
51,289
1948
45,080
61,287
20,649
57,330
A cross section of petitioner's business transactions with six of the Kay Kimbell companies is as follows: Amount Owed to Petitioner
Approximate average during fiscal years
ended
Company
1945
1946
1947
1948
Kimbell Elevators
$336,200
$ 92,400
$142,000
$229,600
Graham Mill & Elevator
557,300
516,300
733,900
313,800
Seguin Milling
576,500
353,300
377,400
838,800
Texas Milling
44,600
190,500
335,300
656,800
Kimbell-Diamond Milling
52,500
268,500
471,300
179,300
Kimbell Oil Mill
421,700
134,400
*310 The gross sales and net income of petitioner are shown below: Year Ended
May 31
Gross Sales
Net Income
1945
$19,910,838
$ 328,019
1946
20,885,116
308,480
1947
24,650,646
1,012,707
1948
42,146,597
646,024
The retrogression of net income in 1948 was caused by a $229,814 loss sustained by petitioner's terminal elevator when the grain market declined in February, 1948. During or before the year 1940, Kay Kimbell and his wife established the Kimbell Art Foundation. Kay Kimbell was one of the five directors of this Art Foundation during each of the years in question. Petitioner's contributions to this Foundation and all other miscellaneous contributions are shown below: Other
To Kimbell Art
Miscellaneous
Year
Foundation
Contributions
1945
$17,500
$3,110
1946
12,500
2,402
1947
17,500
2,600
1948
30,000
1,750
Respondent has computed the amount of additional taxes for petitioner's individual shareholder, if the petitioner had distributed its total net earnings after taxes to the shareholder, as follows: Additional tax based on
Taxable
Income
Tax
dividend of 99.75% of net
Year
Per Return
Reported
earnings after taxes
1945
$ 52,994
$ 11,518
$ 80,550
1946
64,945
13,440
65,193
1947
892,214 *
222,550
286,149
1948
73,063
14,901
134,916
*311 A comparative balance sheet of petitioner corporation follows: June 30, 1920
May 31, 1945
May 31, 1946
May 31, 1947
CURRENT ASSETS
Cash
$ 67,044.03
$1,246,135.87
$ 605,605.26
$ 665,152.82
Government
42,488.64
46,000.00
43,500.00
43,500.00
Obligations
Notes Receivable
1,944.00
100,239.44
30,612.86
77,117.77
Accounts Receivable
237,073.39
1,110,736.29
1,007,592.54
1,129,367.38
Inventory
142,571.27
1,166,742.60
1,506,009.57
2,374,618.47
Advances on Storage
2,499.25
Grain
Total Current Assets
$491,121.33
$3,672,353.45
$3,193,320.23
$4,289,756.44
OTHER ASSETS
(Securities, Misc.)
4,126.11
352,239.12
2,673,542.15
397,608.75
FIXED ASSETS
149,575.76
690,305.25
827,092.47
1,243,347.75
Total
$644,823.20
$4,714,897.82
$6,693,954.85
$5,924,712.94
CURRENT LIABILITIES
Accounts Payable
$ 17,352.02
$ 5,039.73
$ 25,639.88
$ 94,219.18
Notes Payable
986,212.32
2,286,212.32
1,100,000.00
Due Affiliated
330,808.08
619,929.16
Companies
Miscellaneous
6,253.43
206,614.17
8,084.42
Liabilities
Income Taxes
132,245.06
119,584.86
380,838.84
Miscellaneous Taxes
36,118.72
28,858.78
110,420.10
Total Current
$ 17,352.02
$1,496,677.34
$3,286,839.17
$1,693,562.54
Liabilities
CAPITAL
Capital Stock
$125,000.00
$2,500,000.00
$2,500,000.00
$2,500,000.00
Capital Surplus
192,162.79
Surplus
502,471.18
850,465.54
1,026,700.54
1,919,826.45
Federal Income Tax
132,245.06
119,584.86
380,838.84
Balance
$ 718,220.48
$ 907,115.68
$1,538,987.61
Total Capital and
$627,471.18
$3,218,220.48
$3,407,115.68
$4,231,150.40
Surplus
Total Liabilities and
$644,823.20
$4,714,897.82
$6,693,954.85
$5,924,712.94
Capital
Current Ratio
28.3%
2.45%
0.97%
2.53%
*312 May 31, 1948
CURRENT ASSETS
Cash
$ 802,044.68
Government Obligations
43,500.00
Notes Receivable
86,563.18
Accounts Receivable
1,640,998.32
Inventory
2,572,136.51
Advances on Storage Grain
Total Current Assets
$5,145,242.69
OTHER ASSETS
(Securities, Misc.)
390,226.53
FIXED ASSETS
1,313,655.68
Total
$6,849,124.90
CURRENT LIABILITIES
Accounts Payable
$ 826,026.34
Notes Payable
1,100,000.00
Due Affiliated Companies
Miscellaneous Liabilities
Income Taxes
243,378.21
Miscellaneous Taxes
49,558.94
Total Current Liabilities
$2,218,963.49
CAPITAL
Capital Stock
$2,500,000.00
Capital Surplus
188,527.22
Surplus
2,185,012.40
Federal Income Tax
243,378.21
Balance
$1,941,634.19
Total Capital and Surplus
$4,630,161.41
Total Liabilities and Capital
$6,849,124.90
Current Ratio
2.32%
The original paid-in capital stock account of $125,000 has been increased by the capitalization of earnings so that a capital stock of $2,500,000 was reported during the years 1945 and 1948. New stock was not issued, but the value of existing shares was increased upon the advice of bankers. Petitioner was not availed of for the purpose of preventing *313 the imposition of the surtax upon its sole shareholder and, further, the earnings or profits were not permitted to accumulate beyond the reasonable needs of the business. Opinion Petitioner contends that there were valid and compelling reasons why it could not afford to pay dividends and further that its surplus accumulation was "not unreasonably large for the needs of its business". Respondent, on the contrary, asserts that "the petitioner was availed of for the purpose of avoiding individual surtax through the medium of permitting earnings and profits to accumulate rather than be divided and distributed". Respondent further contends that "the petitioner was availed of in the years involved for the purpose of avoiding individual surtax upon its sole stockholder, as evidenced by the accumulation of profits in an unreasonable amount". We think there is some duplication in the contentions of the respondent. Nevertheless, it is evident that the issue to be determined is whether petitioner corporation was "availed of for the purpose of preventing the imposition of the surtax upon its stockholders * * * through the medium of permitting earnings or profits to accumulate instead of *314 being divided or distributed". Section 102(a), I.R.C.
Section 102(c) provides that if the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business it shall be determinative of the purpose to avoid surtax upon the shareholders, unless the corporation, by the clear preponderance of the evidence shall prove to the contrary. The pertinent provision of the Code is highly penal in character. Cf. Mead Corporation v. Commissioner, 116 Fed. (2d) 187. It is intended to curtail tax avoidance and loss of revenue occasioned by unreasonable accumulation of corporate earnings and profits. On the other hand, it does not contemplate that a business should remain static nor does it proscribe an accumulation that is dictated by sound business judgment. Cf. William C. De Mille Productions, Inc., 30 B.T.A. 826. In determining whether petitioner for a given year accumulated profits beyond the reasonable needs of the business we must consider many things. We must consider not only the undistributed earnings or profits of that year, but the surplus already accumulated, the assets and their liquidity, *315 and the expenditures necessary to meet the financial obligations and to carry on a successful operation. Petitioner was incorporated with a paid-in capital of $100,000 in 1917; very shortly thereafter another $25,000 was added to paid-in capital. On May 31, 1948, its balance sheets indicate a total capital and surplus of $4,630,161 of which $200,000 had been paid in, the remainder being composed of earned surplus transferred to capital stock and surplus. In the years before us the capital stock was carried at $2,500,000. Growth was not evidenced by capital and surplus alone. In 1920 total assets amounted to $644,823, and the current liabilities were $17,352 as compared to 1948 with total assets of $6,849,124 and current liabilities of $2,218,963. Respondent would have us believe that petitioner has a paid-in capital stock of $125,000 and accumulated earnings of three or four million dollars. This three or four million dollar figure was ascertained by restoring stock dividends and showing only the original paid-in capital stock of $125,000. We do not adopt respondent's restoration. Certainly, since 1917, petitioner has increased its capital, but considering the volume of business *316 and the speculative nature of the grain business the increase is not unreasonable. We do not find an exorbitant cash or government bond account. This is true when we reconcile the needs of the business wherein grain depositors are similar to bank depositors in that they may make demand for payment for the grain stored in petitioner's elevators. We do not find extensive investments in industries unrelated to petitioner. In fact petitioner's securities account of $374,345 only included securities of corporations having a reasonable connection with the petitioner's business. These investments were shares of stock in three other Kimbell companies engaged in the grain business, an insurance company, a commodity exchange, and a single share of stock in the Chicago Board of Trade. The holding of the insurance company stock effected an insurance rate reduction for the petitioner. The fact that there were no additions to the securities account during the years in question further minimizes the effect of the securities account as evidence of the prohibited purpose. Respondent calls attention to the fact that petitioner owned less than 90 per cent of the stock in these companies, and contends *317 that this fact requires a ruling in respondent's favor under Regulations 111, section 29.102-3. Respondent cites Stanton Corporation, 44 B.T.A. 56, in support of his contention. The Stanton case was but little like the present case. It was there held that the corporation, from the outset, was a mere holding or investment corporation, and that it was formed for the purpose of avoiding surtax on the shareholders. It was held further that the taxpayer permitted its profits to accumulate beyond the reasonable needs of its business, and that it was availed of for the proscribed purpose. The record clearly supported all of these findings. No such findings are possible on the record in the instant case and clearly the Stanton case is not controlling. The respondent in Crawford County Printing & Publishing Co., 17 T.C. 1404 (promulgated February 29, 1952) made the same argument that is presented here. However, we, following the Crawford County case, "are unwilling to give such a sweeping and conclusive effect to the regulation cited". A further examination of corporate history continues to reveal its prodigious growth. The 1920 inventory was $142,571, while for *318 1945 and 1948 it increased from $1,166,742 to $2,572,136. We find a like increase in the fixed assets. In 1920 fixed assets were valued at $149,575, in the years 1945 and 1948 they were valued at $690,305 and $1,313,655. Actually, we see that we do not have an accumulation of earnings but rather an accumulation of plan equipment and facilities by which petitioner has been enabled to sustain and increase its income. Growth in itself would not make the petitioner impervious to section 102; but expansion in its own business and in related businesses, rather than in unrelated industries, does indicate a proper purpose and not the interdiction of section 102. Cf. Dill Manufacturing Co., 39 B.T.A. 1023, and Seaboard Security Co., 38 B.T.A. 560. A survey of the comparative balance sheets for the years before us indicates that a substantial part of petitioner's current assets are in notes receivable and accounts receivable, and from the evidence we note that these accounts record transactions between petitioner and other Kay Kimbell companies. If we adopt respondent's contention that these accounts do in fact represent loans to finance Kay Kimbell companies, *319 which we do not, we would have cogent evidence supporting the proscribed purpose. In the years 1945 and 1946 petitioner's gross sales were approximately $20 and $21 million and of this only $2 and $4 million were made up of sales to other Kay Kimbell companies; in 1947 and 1948 gross sales were approximately $25 and $42 million and of this other Kay Kimbell companies' purchases were between $3 and $5 million. These transactions with other Kay Kimbell companies were made as arm's length transactions in the regular course of business. Where notes were outstanding the current rate of interest was collected from the debtor. Keeping in mind the total quantity sold to other Kay Kimbell companies, the maximum of all accounts receivable, both trade and affiliate companies, at the end of any one year in question has not exceeded $1,700,000. Even assuming all of the accounts receivable are from Kay Kimbell companies, which they are not, the outstanding accounts receivable represent a small percentage of petitioner's gross sales. This evidence does not support the imputation that petitioner financed the other Kay Kimbell companies. Of the notes receivable, the maximum amount of $100,239 was *320 outstanding at the end of 1945, and more than half of this was secured. This $100,239 represented only 2.2 per cent of petitioner's total assets. We can not find from these accounts evidence of the interdicted purpose. We find nothing in the purchase of the Walker-Smith Wholesale Grocery Company and its subsequent liquidation to bring petitioner within the purview of section 102. The purchase of this company expanded petitioner's existing "heavy grocery" department, made certain exclusive name brands available to petitioner, and gave petitioner additional valuable outlets. Thus, the purchase was motivated by valid business considerations and was an extension of petitioner's business rather than an expansion in an unrelated business. Petitioner's extensive monthly borrowings do not in themselves evidence the prohibited purpose of section 102. We realize, because of the seasonal character of the grain business and its tremendous dollar volume, that large loans may be necessary for the successful conduct of the business. In fact, if petitioner were able to self-finance its extensive operations, evidence of this financial independence would be indicative that an accumulation existed *321 for the prohibited purpose of section 102. The ratio of current assets to current liabilities during the years in question further supports petitioner's position. This ratio of approximately 2 1/2 to 1 is indicative of a reasonable accumulation of surplus. Cf. R. C. Tway Coal Sales Co. v. United States, 3 Fed. Supp. 668; affd., 75 Fed. (2d) 336. A comparison of the current net working capital - the excess of current assets over current liabilities - with a total of capital stock and surplus indicates that the net working capital during the years in question was less than twice the total of capital stock and surplus. Considering the need for quick assets and the speculative nature of the grain and commodity business, this comparison indicates a reasonable surplus and does not indicate the prohibited purpose. We must also consider those factors which tend to militate against petitioner's position: (1) petitioner has a history of no dividend payments; (2) Kay Kimbell's individual surtax liability would have been substantially increased if petitioner paid out its earnings as dividends; (3) petitioner made large charitable contributions to an art foundation *322 in which Kay Kimbell had a personal interest. The fact that petitioner chose to expand the business rather than pay dividends is a business policy to be determined only by the sagacity and discretion of petitioner's officers and directors. Cf. J. L. Goodman Furniture Co., 11 T.C. 530, and General Smelting Co., 4 T.C. 313. If petitioner had paid out its earnings to Kay Kimbell, his individual surtax liability would have been increased; we take no quarrel with this. However, the mere mathematical computation does not in itself show the intent or purpose necessary to make section 102 applicable. Cf. Cecil B. De Mille, 31 B.T.A. 1161; affd., 90 Fed. (2d) 12; certiorari denied, 302 U.S. 713. Contributions to the Kimbell Art Foundation demonstrate that there was some money which was not essential to the expansion of the business, but it would be inimical to public interest if we were to say that section 102 is applicable when a corporation engages in philanthropic activities but does not pay dividends. We deem it unnecessary to discuss in detail the many cases cited by respondent. All of these, however, have been carefully *323 reviewed and considered by us, but in none of these do we find holdings in conflict with the conclusion which we have reached under the facts of this case. We hold that section 102 is not applicable to the petitioner in the years before us. Decision will be entered for the petitioner. Footnotes
1. Except for the comparative balance sheets, cents are omitted from all amounts herein.↩
*. (Totals include amounts "from" and "to" Kimbell Enterprises.)↩
*. (Includes capital gain from sale of oil properties.)↩