Thomas S. Lee Enterprises, Inc., Transferee v. Commissioner. Don Lee, Incorporated v. Commissioner.
Thomas S. Lee Enterprises, Inc., Transferee v. Commissioner
Docket Nos. 26662, 26663.
United States Tax Court
1953 Tax Ct. Memo LEXIS 195; 12 T.C.M. (CCH) 730; T.C.M. (RIA) 53228; June 29, 1953
Raymond C. Sandler, Esq., 6253 Hollywood Boulevard, Los Angeles, Calif., and Nelson Rosen, Esq., for the petitioners. W. Lee McLane, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: In Docket No. 26663, Don Lee, Incorporated, the Commissioner determined a deficiency in income tax for the year 1946 in the amount of $327.058.74. Most of the deficiency is in tax under section 102, I.R.C. Thomas S. Lee Enterprises, Inc., is the transferee of Don Lee, Incorporated. In Docket No. 26662, Thomas S. Lee Enterprises, Inc., Transferee, the Commissioner has determined that its liability as transferee of assets of Don Lee, Incorporated, is $327,058.74 for 1946. The only question for decision *196 is whether the petitioner, Don Lee, Incorporated, was subject to surtax under section 102 for improperly accumulating surplus. Findings of Fact The facts which have been stipulated are found as facts. The stipulation is incorporated herein by reference. Don Lee, Incorporated, hereinafter referred to as the petitioner, was a corporation organized under the laws of the State of California, with its principal office at 1076 West 7th Street, Los Angeles, California. The return for the period involved was filed with the collector for the sixth district of California. The petitioner reported its income on a calendar year basis and employed an accrual method of accounting. The petitioner was engaged in the automobile business. At all times material hereto, Don Lee, Incorporated, was the exclusive wholesale distributor for Cadillac automobiles, parts and accessories in the State of California. In addition, the petitioner operated several retail agencies for the sale and service of Cadillac and Oldsmobile automobiles in the State of California. The business of Don Lee, Incorporated, commenced in the year 1903, when Donald Musgrave Lee entered into the horseless carriage business in *197 San Francisco, and shortly thereafter, acquired a franchise for the sale of Cadillac automobiles. He operated the automobile business as an individual until 1922. In 1922 Lee incorporated the business under the name of Don Lee, Incorporated, transferred to the corporation all of the assets of his business, and received in exchange therefor all of the capital stock of Don Lee, Incorporated. The assets transferred by Lee to Don Lee, Incorporated, were valued at $1,160,000, for which the corporation issued to him 11,500 shares of its authorized capital stock of a par value of $100 per share, and paid him the sum of $10,000 in cash. In 1932, Lee organized a corporation known as Don Lee Holding Company to which corporation he transferred all of the stock of Don Lee, Incorporated, and received in exchange all of the stock of Don Lee Holding Company consisting of 5,750 shares. Donald Musgrave Lee died in 1934, at which time he owned all of the stock of the Don Lee Holding Company. His son, Thomas Stewart Lee, R. Dwight Merrill, and Beatrice Norton were appointed and qualified as executors of his estate. The administration of the estate required approximately fourteen years and was not *198 closed until October 1948. During the taxable year the stock of Don Lee Holding Company, which in turn owned the stock of Don Lee, Incorporated, was vested in the executors of the estate of Donald Musgrave Lee. On or about November 1, 1947, the name of the corporation, Don Lee Holding Company, was changed to "Thomas S. Lee Enterprises, Inc.", one of the petitioners herein. Thomas S. Lee Enterprises is a corporation organized under the laws of the State of California, with its principal office at 1313 North Vine Street, Los Angeles, California. Effective as of the close of business on February 29, 1948, Don Lee, Incorporated, was completely liquidated and dissolved and all of its assets were transferred to its sole stockholder, Thomas S. Lee Enterprises, Inc., which assumed all of its liabilities. The assets thus transferred exceeded in value the amount of the income tax deficiency here involved. During the taxable year, the officers and directors of the petitioner were Thomas S. Lee, President, F. W. Pabst, Vice-President, L. G. Patee, Vice-President, J. E. Brown, Vice-President, D. L. Hunter, Controller, Secretary and Treasurer. The officers, with the exception of J. E. Brown, *199 constituted the Board of Directors of the petitioner. Thomas S. Lee had been active in the business for a few years prior to his father's death in 1934, and upon his father's death, became President of the petitioner. Hunter had been associated with the petitioner for more than 20 years. In 1945 he became Controller and Secretary-Treasurer, which positions he occupied until dissolution of the corporation in 1948. Pabst, Patee, and Brown had been associated with the business in various capacities for more than 30 years. Thomas S. Lee, L. G. Patee, and J. E. Brown all died prior to the trial of this proceeding. The automobile business of the petitioner, prior to and during the taxable year, comprised the following activities: A wholesale distributorship for Cadillac automobiles, parts, and accessories throughout the State of California. Wholesale distribution was carried on in northern California through a branch located in San Francisco, and in southern California through a branch located in Los Angeles. The operation of six retail agencies in the State of California for the sale and service of Cadillac and Oldsmobile automobiles. The retail agencies were located in San Francisco, *200 Oakland, Los Angeles, Burlingame, San Diego, and Pasadena. Every Cadillac automobile sold in the State of California, whether through retail agencies owned by the petitioner or other retail agencies, was distributed to such retail agencies through the petitioner. Each of the petitioner's retail agencies was also engaged in the used car business. The petitioner operated under two separate distributor selling agreements with Cadillac Division of General Motors Corporation, one for the northern half of California, and one for the southern half of California. The petitioner, as wholesale distributor and subject to the approval of Cadillac Division, would enter into dealer selling agreements with each retail Cadillac agency in the State of California, including its own retail agencies. Each of the petitioner's retail agencies would enter into direct dealer selling agreements with the Oldsmobile Division of General Motors Corporation with respect to the retail sale of Oldsmobile automobiles. The aforementioned agreements are sometimes referred to herein as "franchises". Except for a period during World War II, the distributor and dealer agreements were for terms of one year, commencing *201 on November 1 of each year and ending on October 31 of the following year. The agreements automatically terminated at the end of each year without notice or action of any party. There was no obligation on the part of General Motors to grant new franchises, and no distributor or dealer had assurance from year to year that new franchises would be granted. The distributor and dealer franchises held by the petitioner during the taxable year were entered into in 1944. The franchises were for a term expiring at the end of the 24th month following the month in which the first Cadillac automobile for domestic distribution was produced subsequent to January 1944. The first Cadillac automobile for domestic distribution was produced on October 17, 1945, and the petitioner's franchises expired on October 31, 1947. In 1946, the petitioner was the largest distributor of Cadillac and Oldsmobile automobiles in the world. It distributed and sold 9.8 per cent of all automobiles manufactured and produced by the Cadillac Motor Car Division of General Motors Corporation, hereinafter sometimes referred to as Cadillac Division, for sale in the United States. The petitioner owned a six-story building *202 in San Francisco in which it operated its wholesale distributorship in northern California as well as its San Francisco retail Cadillac and Oldsmobile agency. Until 1944, petitioner had leased a seven-story building at Seventh and Bixel Streets, Los Angeles, California, in which it operated its wholesale distributorship for southern California and its Los Angeles retail Cadillac and Oldsmobile agency. In 1944, the petitioner purchased this building and adjoining property at a total cost of $320,000, of which sum $240,000 was secured by a mortgage. The property was purchased because the corporation was unable to secure a favorable renewal of its lease which was to expire in December 1945. The petitioner leased the premises in which it operated its retail agencies in Oakland, Burlingame, San Diego, and Pasadena. The petitioner's gross sales, net income after taxes, dividends paid, and earned surplus, per books, for the years 1940 to 1946, inclusive, were as follows: Net Income
Dividends
Earned
Year
Gross Sales
After Taxes
Paid
Surplus *
1940
$12,498,129
$ 55,488
$40,000
$ 198,793
1941
16,512,786
325,234
75,000
407,719
1942
3,216,343
64,555
23,000
465,447
1943
3,292,485
97,723
600,939
1944
3,444,289
104,063
750,153
1945
3,863,087
115,770
881,763
1946
13,888,414
878,867
1,754,538
*203 In some years prior to 1941, the operations of the petitioner had been hampered by reason of inadequate capital. During the four year period from 1931 to 1934, inclusive, the petitioner sustained operating losses totaling $627,000. For the years 1933 to 1936, inclusive, the petitioner's surplus account showed a deficit. The deficit reached a high of $374,056 in 1934, and was $60,862 in 1936. During the period from 1933 to 1941, inclusive, it was necessary for the petitioner to finance a substantial part of its new and used car inventories. New cars were shipped from the factory to the petitioner with a sight draft bill of lading attached. The outstanding indebtedness of the petitioner for inventory financing varied from month to month. For example, in 1939, it reached a high of $730,385 in February, and a low of $64,992 in August. The building which the petitioner owned in San Francisco was encumbered by mortgages. The petitioner paid approximately $400,000 *204 in interest charges on sums borrowed for business purposes during the period from 1932 to 1941, inclusive. There were occasions, prior to 1940, when the petitioner, in order to meet its payrolls and pay its accounts, had to quickly convert its assets into cash, and had to sell its used cars at wholesale below cost, a practice referred to in the trade as "dumping". In 1940 the officers and directors of the petitioner decided that in the future the corporation would attempt to accumulate sufficient capital to enable the corporation to eliminate all borrowing. During the year 1942, both the Cadillac Division and the Oldsmobile Division of General Motors Corporation ceased to manufacture new cars on account of World War II. As a result, the petitioner did not receive any new Cadillac or Oldsmobile automobiles for sale until the years 1946. During the intervening period, the petitioner sold the remaining new cars which it had on hand and engaged in the business of buying and selling used cars, servicing and repairing automobiles, and in selling parts and accessories. On December 20, 1943, the Board of Directors adopted the following resolution: "WHEREAS, a study of the financial *205 statements of this corporation shows that the operations have been seriously hampered for the past decade and the potential profits therefrom impaired by reason of inadequate capital, and "WHEREAS, earnings and profits for the duration of the war cannot be predicted with any remote degree of certainty, and "WHEREAS, there will certainly be a need for increased working capital after the war due to expected increases in volume of business, "NOW, THEREFORE, BE IT RESOLVED, that this board adopt, and does hereby adopt an extremely conservative policy with respect to the conduct of its operations and to the distributions of its earnings, during the period of the duration of the war and for as long thereafter as the management may deem advisable." Under its franchise agreements with General Motors Corporation, the petitioner agreed to maintain places of business, including salesrooms, service stations and used car facilities, satisfactory to the Cadillac and Oldsmobile Divisions, and not establish a new location, or branch without the consent of General Motors. In 1944, the petitioner was notified by the Oldsmobile Division that, when the manufacture of new automobiles was resumed, *206 petitioner would be required to separate the retail sales operation for Oldsmobile automobiles from its retail sales operation for Cadillac automobiles in Los Angeles, and that it would be necessary to obtain a separate location for each of such operations. In compliance with this request, the petitioner, on December 5, 1944, purchased land located at Wilshire and Ardmore in Los Angeles, for the sum of $84,000 for the purpose of erecting thereon a Cadillac retail sales and service agency. The proposed new agency was to serve the entire Los Angeles Metropolitan area. It was believed by the officers of taxpayer that it would have to also acquire additional property to properly provide for the Cadillac business in this area. At a meeting of the Board of Directors on December 19, 1944, E. W. Bolter who was then the Controller and Secretary-Treasurer of the petitioner, suggested that the corporation could realize substantial profits in the future by financing its own conditional sales contracts, instead of assigning them to banks or the General Motors Acceptance Corporation. He estimated that the post war requirements of the corporation, in addtitionto its ordinary working capital, for *207 the aforementioned and other purposes would approximate $1,700,000. Bolter's estimate of post war requirements covered the elimination of inventory financing, $500,000; the financing of conditional sales contracts, $750,000; the erection of a building on the land acquired at Wilshire and Ardmore, in Los Angeles; and other improvements of $150,000. The estimate of $300,000 for the Wilshire and Ardmore building was based on discussions with architects. The estimate did not represent the anticipated total cost of construction but was only the amount of actual cash required by the petitioner, and did not include the cost of equipping the building. The Board of Directors approved the suggestion and estimate of post war requirements made by Bolter, and adopted a resolution that the corporation should create a reserve for its post war requirements. In March 1945, Hunter succeeded Bolter as Controller and Secretary-Treasurer of the petitioner. In November 1945, the corporation entered into a credit agreement with the Security-First National Bank of Los Angeles, and the American Trust Company of San Francisco. The banks agreed to lend the petitioner sums not to exceed a total of $650,000, *208 at such times before November 1, 1947, as requested by the corporation. The credit agreement was entered into for the dual purpose of enabling the corporation to pay off existing mortgages on both San Francisco and Los Angeles buildings, resulting in a large saving of interest charges, and, to finance the construction of the new building at Wilshire and Ardmore, in Los Angeles. The agreement provided that the proceeds of the loans would be used first, to discharge all existing indebtedness on the corporation's fixed assets and, thereafter, "for the purpose of acquiring or improving its fixed assets and for no other purpose." The automobile business is highly competitive in normal times. The period immediately following the close of World War II was abnormal due to the fact that there were few automobiles manufactured during the War period. The demand for automobiles on the part of the buying public was unusual and exceeded the production and availability of automobiles. The petitioner, in 1946, was selling automobiles as quickly as it could get them ready for delivery. The Cadillac Division allotted cars to the various distributors and dealers throughout the United States on an *209 allotment basis. The petitioner's allotment for the year 1946 was 9.8 per cent of the total Cadillac domestic output of new cars. No one in the automotive business in 1946 could predict with any degree of accuracy how long the "seller's market" in new and used cars would continue. The petitioner's gross sales increased from $3,863,000 in 1945 to $13,888,000 in 1946. The 1946 earnings of the petitioner before taxes in the sum of $1,416,073.85, and its net income after taxes in the sum of $878,867.26 were unprecedented in the history of the corporation. At all times material hereto each of the petitioner's distributorship and retail agencies was conducted, as far as practicable, as an independent business. In 1946 the petitioner employed a total of about 550 persons, and its payroll was in excess of one and a half million dollars. The following is a composite balance sheet of the petitioner corporation for the years 1945 and 1946, as prepared by the revenue agent who examined the petitioner's income tax return for the year 1946. Assets
Dec. 31, 1945
Dec. 31, 1946
Cash
$1,076,861.33
$1,962,270.12
Notes and Accounts
Receivable
531,682.53
666,031.98
Inventories
346,421.47
709,800.22
Securities
134,980.00
134,980.00
Other Investments
None
None
Depreciable Assets
1,684,463.31
1,757,439.10
Reserve for Depre-
ciation
(857,945.98)
(896,490.64)
Land
335,896.73
334,840.05
Prepaid Expenses
18,676.49
26,989.15
Income Tax Refund
3,983.35
Total Assets
$3,275,019.23
$4,695,895.98
Liabilities
Accounts Payable
$ 772,772.47
$ 865,725.15
Notes Payable
None
None
Mortgage Payable
306,662.47
254,625.00
Taxes Payable
12,296.13
127,625.17
Other Expenses Pay-
able
328.86
None
Reserves: Income Tax
138,027.84
537,509.14
Bad Debts
1,595.24
3,979.12
Contingencies and
Others
11,572.50
1,858.00
Capital Stock
1,150,000.00
1,150,000.00
Earned Surplus
881,763.92
1,754,538.40
Total Liabilies
$3,275,019.23
$4,695,859.98
*210 Substantially all of the securities owned by the corporation were United States War and Defense Bonds purchased in the years 1943 to 1945, inclusive. The amounts listed in the balance sheet as "Notes and Accounts Receivable" included the sum of $245,210.67, which the petitioner claimed was owed to it by the Estate of Donald Musgrave Lee, Deceased. At his death in 1934, he was indebted to the petitioner in the sum of $245,210.67, for loans made to him by the petitioner for his personal expenditures. The indebtedness of Lee was carried on the petitioner's books as a "Deferred Asset". The claim of the petitioner against the Estate of Donald Musgrave Lee was not filed within six months after the publication of notice to creditors by the executors of the estate. The notice to creditors was published on October 16, 1934. The claim of the petitioner against the estate was not filed until November 22, 1935. As a result the petitioner's officers were advised by their attorneys tha the claim was not collectible. For this reason, the petitioner's officers did not consider the claim as an account receivable, and carried it as a deferred asset since its collectibility was doubtful. The claim *211 was paid in full by the executors of the Lee estate in February 1948. The sum of $254,625 carried as "Mortgage Payable" on the balance sheet as of December 31, 1946, represented the amount owed under the aformentioned bank credit agreement. In May 1946, the petitioner borrowed, under the loan agreement, the sum of $291,000 payable in installments of $4,850 per month until May 1, 1951, at which time the unpaid principal and interest would become due and payable. The sum of $50,925 was payable during the year 1947. The petitioner had eliminated the mortgage indebtedness reflected on the 1945 balance sheet. The following schedule reflects the net working capital of the petitioner as of December 31, 1946, including its earnings for 1946: Current Assets:
Cash
$1,962,270
Conditional Sales Contracts
49,818
Accounts Receivable (Less Reserve
of $39,793)
312,241 *
Inventories
709,800
Securities
134,980
Discount Receivable
43,913
Prepaid Expenses
26,989
$3,240,011
Current Liabilities: Accounts Payable
$706,915
Customers' Car Deposits
288,233
Federal Income Taxes
for 1946
537,509
Current Payments on
Credit Agreement
50,925
$1,583,582
Net Working Capital
$1,656,429
*212 Customers' Car Deposits in the amount of $288,233 was segregated in a separate bank account and was not used by the petitioner in the operation of its business. The sum represented deposits made by customers with orders for new cars. The orders were subject to cancellation and refund of deposits. The sum of $537,509 for Federal income taxes was the estimated income tax on 1946 earnings and pursuant to resolution of the Board of Directors on December 4, 1946, was deposited in separate bank accounts for use in paying taxes. In addition to the foregoing liabilities, the petitioner was contingently liable on conditional sales contracts which it had assigned to lending institutions in the approximate sum of $266,000. The petitioner's losses as a result of this contingent liability were negligible. Under the terms of the General Motors franchise agreements of 1944, petitioner was required to provide and maintain initial working capital in the amounts specified by General Motors, subject to such revisions as might be determined and agreed upon by General Motors and the petitioner. As of October 12, 1945, General *213 Motors established the normal minimum working capital requirements for each of petitioner's branches as follows: Los Angeles
$327,466
Pasadena
52,465
San Diego
74,818
San Francisco
273,799
Burlingame
52,842
Oakland
134,472
Total
$915,842
The foregoing minimum requirements for working capital made no allowance for the carrying of conditional sales contracts or for any capital asset expenditures and, therefore, a dealer had to make provision for additional working capital in addition to the required minimum for those purposes. In July and August 1946, petitioner learned that the Cadillac Division of General Motors was soon going to establish different and higher minimum working capital requirements. The new working capital program of the Cadillac Division was completed in the first quarter of 1947. However, petitioner did not receive anything in writing about the new requirements from the Cadillac Division before December 31, 1946. On May 7, 1947, written supplements to the franchise agreements were executed by each of the agencies in petitioner's organization. By such supplemental agreements, petitioner was required to own and to maintain as its working *214 capital not less than the sum of $1,420,965 distributed among its various branches as follows: Los Angeles
$ 520,645
San Francisco
380,570
San Diego
133,935
Oakland
213,405
Burlingame
93,855
Pasadena
78,555
Total
$1,420,965
If petitioner maintained the standard stocks of new cars, retail and wholesale, contemplated by the formula established by the Cadillac Division without resorting to borrowing from lending institutions to defray a portion of the cost of such inventories, its normal working capital requirements would have been $1,982,075. In formulating its new working capital program, the Cadillac Division adopted a 56,000 new car volume, which it referred to as its "standard new car volume," as representing the number of new cars which it intended to produce during each normal year. Predicated upon this "standard new car volume" and the quotas assigned to its various dealers and distributors, Cadillac then determined, in accordance with a formula, the "standard stock" of new cars which it would require each of its respective dealers and distributors to normally maintain. Based thereon, and also taking into consideration the used car sales volume, *215 parts and accessories sales volume, and cost of operations as reflected by past experience, Cadillac then established the minimum working capital which it would require each dealer or distributorship operation to maintain in order to be able to properly and safely conduct its operations during a normal year. The new working capital program required each dealer and/or distributor to own and maintain, as a minmum, working capital funds sufficient to cover and pay for the following: (a) One average month's operating expenses; (b) One average month's investment in prepaid expenses; (c) One average month's investment in accounts receivable; (d) 100% of the cost of company cars and demonstrators, including freight, handling and accessories in connection therewith; (e) 100% of the cost of one average month's inventory of used cars; (f) 66 2/3% of the cost of three months' supply and stock of parts; (g) 50% of the cost of two months' supply and stock of accessories; (h) 60% of the cost of its standard stock of new cars, retail, including cost of freight, handling, and accessories in connection therewith; and (i) 15% of the cost of its standard stock of new cars, wholesale, *216 including cost of freight, handling and accessories in connection therewith. Under the formula, it was contemplated that a dealer and/or distributor could, if it desired, borrow from lending agencies 85 per cent of the cost of its standard stock of new cars, wholesale, and 40 per cent of the cost of its standard stock of new cars, retail, and that it could purchase one month's supply of parts and one month's supply of accessories upon credit. The minimum working capital requirements as established by the supplements executed on May 7, 1947, did not make any provision for the carrying of conditional sales contracts, nor for any sums which might be required for capital expenditures. Any sums required for financing conditional sales contracts or for capital expenditures would have to be provided in addition to the amounts prescribed in such minimum working capital requirements. Petitioner sold new and used automobiles to customers, both for cash and upon conditional sales contracts. Prior to World War II, petitioner had carried only a few of these sales contracts itself and had assigned most of such contracts to General Motors Acceptance Corporation, banks and other lending institutions. *217 The following is a comparison of the total aggregate unpaid balance due on conditional sales contracts carried by petitioner and assigned to others as of the end of the years 1939, 1940, and 1941: Carried
Assigned
by
to
Petitioner
Others
December 31, 1939
$24,069
$756,737
December 31, 1940
40,599
934,231
December 31, 1941
16,946
999,228
During the war years of 1942, 1943, and 1944, it was unnecessary for petitioner to either carry or assign conditional sales contracts in connection with its operation. The carrying of conditional sales contracts is a reasonable and desirable operation for an automobile dealer to engage in, particularly in the case of sales of higher priced automobiles, such as Cadillac, to responsible buyers. It is very lucrative and provides fixed income during periods of slack business and depression. In addition, such business is beneficial because of the continuing contact with customers created thereby and such customers furnish the sales force with a good source of repeat business. The sale of insurance which is also highly profitable, usually goes hand-in-hand with the carrying of conditional sales contracts. The operation *218 of carrying conditional sales contracts by an automobile dealer, such as the petitioner, would require a considerable organization to take care of the accounting, collections, repossessions and the sale of insurance in connection therewith. Hunter's estimate that the petitioner would require an additional sum of $100,000 for carrying conditional sales contracts over and above the sum of $35,000 which was being utilized for such purpose on October 31, 1946, was based upon the amount of money which would be needed immediately to put into such contracts. It was believed that the approximate sum of $750,000 would be ultimately required for carrying such contracts after petitioner had set up its conditional sales contract department and was properly functioning in this operation. At December 31, 1946, petitioner carried $49,818 worth of conditional sales contracts and had assigned $265,799 to others. By December 31, 1947, petitioner was carrying itself $172,390 in conditional sales contracts and had assigned to others a total of $356,602. Due to the War years when automobiles and automobile parts and accessories were not readily available, the inventories of petitioner in 1946 were *219 depleted. During the years 1939 and 1940, the last normal years in the automobile business prior to World War II, petitioner had carried in its inventories during the peak months of March, April, May, and June, an everage of 570 new cars at a cost of approximately $735,000, and an average of 500 used cars costing approximately $256,000. During comparable months in 1946, its average inventory consisted of approximately 39 new cars, costing approximately $64,000, and 33 used cars costing approximately $33,000. As of December 31, 1939, petitioner had inventories of 425 new cars and 605 used cars costing $574,686 and $337,230, respectively, whereas on December 31, 1946, petitioner's total inventories consisted of 96 new cars and 83 used cars, costing $202,111 and $81,715, respectively. During the year 1946, petitioner's average monthly inventory in new cars amounted to approximately 57 units, and its sales of new cars during said year amounted to 3,238 units, representing a turnover of approximately 57 times its average monthly inventory. It was the opinion and belief of the officers of petitioner that after the resumption of production of cars in quantity, petitioner would be required *220 to carry as many car units in its inventories as it did during the pre-war years, and that this situation could have developed very quickly if the automobile market turned into a buyer's market. The officers of petitioner knew that the production of Cadillacs in 1946 amounting to approximately 22,000 units, had been much lower than anticipated and that it was the plan of the Cadillac Division to eventually produce up to 100,000 units. Under the quota system which had been established by the Cadillac Division, the factory depended upon its distributors to take their respective quotas of all automobiles, irrespective of whether the distributor wanted all of such automobiles or not. The average cost per car on both new and used cars in 1946 was almost double the average cost per unit in 1939. Based upon the prices which prevailed as of December 31, 1946, petitioner would require the total sum of $1,490,247.50 to carry as many car units in its inventories as it carried as of December 31, 1939, or $1,206,421.50 in addition to the $283,826 already invested in new and used car inventories as of December 31, 1946. Pursuant to the policy adopted by the Board of Directors of petitioner *221 in 1940, petitioner after the year 1941, used its own funds exclusively to defray the purchase of new and used automobiles and borrowed no money whatsoever to finance any portion thereof. The increased inventory cost was also reflected in the cost of parts and accessories and of "other inventories" consisting of oil, gas, grease, paint, etc. Under the terms and conditions of its franchise, petitioner was required to carry an adequate stock of parts and accessories at all times. Although the seller's market continued through 1947, by December 31, 1947, petitioner had $1,013,019 of its own funds invested in inventory, and of said amount only approximately $360,000 was invested in new and used cars, as compared to an investment of approximately $900,000 in new and used cars as of December 31, 1939, when the cost was almost one-half as much as in 1946. During the year 1946, petitioner had not been able to commence construction of its new building at Wilshire and Ardmore, due to the Federal building restrictions and regulations which were then in effect. At the Board of Directors' meeting of petitioner held on December 4, 1946, Hunter estimated that the sum of $300,000 in cash would *222 have to be made available for the construction of this building at Wilshire and Ardmore. This estimate was based upon discussions which petitioner's officers had with contractors and various builders as to the approximate cost of constructing the building contemplated on a per foot basis. The estimated cost of construction was approximately $600,000 and in addition thereto, petitioner would be required to pay 5 per cent of the cost of the building for architect's fees and 10 per cent of the cost for contractor's fees. At this time, all contracts for construction were entered into on a "cost-plus" basis. This would require a total of $690,000 for the cost of the building, exclusive of equipment. There was an additional sum of $390,000 available under the credit agreement with the banks for the construction of the building at Wilshire and Ardmore. The remaining $300,000 required for its construction would have to be supplied by petitioner out of either its earnings or additional loans. Early in 1947, Symes, Manager of the Los Angeles Branch of petitioner, was instructed to proceed with the construction of the building at Wilshire and Ardmore in Los Angeles. The Donald R. Warren Co. *223 , engineers, was retained in March 1947, to prepare preliminary plans and sketches for the proposed building, and such plans were submitted on March 31, 1947. In June 1947, an application was filed by petitioner with the Zoning Administrator of the City of Los Angeles for a zoning variance to permit the use of the real estate involved, consisting of three lots, for the construction of a building to be used as a Cadillac agency for the sale and service of new and used automobiles. This application was approved by the Zoning Administrator on August 14, 1947, upon certain conditions, including the condition that petitioner agree to hold the three lots involved as a single unit. On August 30, 1947, petitioner executed a covenant and agreement in compliance with the aforesaid conditions and said agreement was recorded on September 22, 1947, in the County Recorder's Office. In July of 1947, petitioner conducted negotiations with the Ragnar Benson Construction Company, to provide the necessary work and engineering services to complete the plans and specifications for the new building, and said Construction Company thereafter prepared a final sketch, and final plans for the building. On or *224 about September 10, 1947, petitioner's officers approved the plans and directed that the specifications be drawn and submitted to bidders. The plans were also submitted to the Cadillac Division for approval and suggestions. At the time of the discussions and conferences with the Ragnar Benson Construction Company, it was estimated that the total cost of the building, including architect's and contractor's fees, would be $690,000. In addition to the cost of construction, it was estimated that $150,000 would be reasonably required for machinery, shop equipment, fixtures, furniture, etc., for the proposed new building. This estimate was based upon a survey which was made by Symes, and Keene, the Service Manager in Los Angeles. It was planned by petitioner to make the new building an ultra modern Cadillac agency, fully equipped with the latest type of service equipment and machinery, sales room, executive offices, general office, and office furniture and equipment. Prior to World War II, petitioner did not have adequate modern mechanical equipment. Its building at Seventh and Bixel Streets, Los Angeles, needed extensive alterations, and the facilities of the branches located in Pasadena, *225 Burlingame, and Oakland were in need of replacements. In December 1944, petitioner's Board of Directors was advised that expenditures totaling $150,000 were required for improved buildings and equipment. By 1946, 75 per cent of petitioner's mechanical equipment needed replacements because of the heavy use thereof during the war years, and because of obsolescence. During the war years, machinery and equipment for replacement could not be obtained. Depreciation reserves were inadequate because of substantial increases in replacement costs. At petitioner's six branches, a substantial amount of assets were fully depreciated as of December 31, 1946. During 1947, petitioner actually expended $141,443.52 for machinery, shop equipment, parts and accessories equipment. In 1946, petitioner had spent $72,975.79 for improvements, and during the period from 1941 to 1947, petitioner's total net expenditures for land and depreciable assets amounted to $727,743.51. At the end of December 1948, those who took over the Pasadena retail agency, formerly operated by petitioner, found its equipment, machinery and fixtures in very poor condition and were compelled to immediately expend approximately $25,000 *226 for replacements. At the end of 1948, the Cadillac Division acquired from petitioner the building at Seventh and Bixel Streets in Los Angeles, and the remodeling and changes to that building which had been contemplated and planned by petitioner were eventually carried out by the Cadillac Division. Cadillac found the machinery and equipment in this building virtually obsolete and worn out, and immediately after taking it over, spent approximately $75,000 or $80,000 for machinery and shop equipment alone. As of the end of 1946, petitioner needed to maintain a reserve of $250,000, at least, for contingencies to cover payments on bank loans, losses from operations based upon past experience, expansion, lease renewals, improvements, and the establishment of any new divisions which the Cadillac Division might require or approve. The petitioner, in 1948, actually opened a retail sales and service branch in Sherman Oaks, Los Angeles, and purchased the land for the location of the new division for $250,000. This new branch was considered in 1946. The new building for this division cost $550,000. If petitioner had continued in business after 1948, it probably would have opened a new agency *227 at 8th and LaBrea Streets in Los Angeles as the Cadillac Division did in 1949. In October 1947, petitioner received oral notification that General Motors would not renew its franchise agreements beyond October 31, 1948. This was the first indication that petitioner's franchises, which it had held for more than 40 years, would not be continued. The Cadillac Division submitted to petitioner, on October 22, 1947, new franchise agreements which ran only to October 31, 1948, and formally advised petitioner that it intended to take over dealerships and distributorships operated by petitioner after October 31, 1948. After October 22, 1947, there were extensive negotiations with the Cadillac Division. However, petitioner immediately stopped its plans to construct a building at Wilshire and Ardmore, and abandoned its plan to make other large capital improvements and to carry a large portion of its conditional sales contracts. The Board of Directors of petitioner held a meeting on December 26, 1947, at which meeting Hunter pointed out that petitioner could not make any definite plans nor determine its capital needs for the coming year because of the various propositions which had been submitted *228 to the Cadillac Division which would materially affect the future operations of petitioner. Because of these uncertainties, it was recommended that the corporation pay a dividend to its stockholders in the sum of $650,000, and that consideration of the payment of an additional dividend be deferred until the financial condition of the corporation had been ascertained and the status of petitioner's franchise agreements with the Cadillac Division had been resolved. A dividend of $650,000 was thereupon declared and paid. As a result of the negotiations with the Cadillac Division, it was finally agreed early in 1948 that petitioner would be permitted to retain its retail agencies for the sale of Cadillac and Oldsmobile automobiles in Burlingame and San Diego, and would be granted a dealership for the retail sale and service of Cadillac automobiles in the San Fernando Valley of Los Angeles, but that its distributor franchises and its other retail agencies would terminate as of December 31, 1948. The Cadillac Division itself took over the operations theretofore conducted by petitioner, other than the Burlingame and San Diego agencies, as of January 1, 1949, and Fred H. Murray of the Cadillac *229 Division came to Los Angeles to assume the management of the Los Angeles Branch for General Motors Corporation. Distribution by petitioner of its earnings for 1946 would have resulted in a substantial surtax liability for its sole stockholder. Petitioner, Don Lee, Inc., was not a mere holding or investment company. Petitioner did not permit its earnings and profits for the year 1946 to accumulate beyond the reasonable needs of the business. Petitioner was not formed or availed of during the calendar year 1946 for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. Opinion The only question is whether the petitioner, Don Lee, Incorporated, permitted its earnings and profits during 1946 to accumulate beyond the reasonable needs of its business with the result that it was availed of during 1946 for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. See section 102 (a) and (c), Internal Revenue Code. The respondent *230 concedes that the petitioner was not formed for the purpose mentioned in section 102 and was not a mere holding or investment company. The principal stockholder of petitioner would have been liable for additional surtax if petitioner had declared dividends out of its earnings for 1946. The question presented is one of fact to be determined from all of the evidence. Petitioner contends that its accumulated earnings for 1946, after the payment of $537,209 Federal income taxes for 1946, were reasonably, properly, and prudently retained in its business. With this general contention we agree for the reasons set forth hereinafter. The facts have been set forth fully in our Findings of Fact and need not be restated. In the last analysis, all of the facts and factors must be weighed to arrive at a conclusion under the issue presented. We have considered carefully all of the evidence. It overcomes the prima facie correctness of the respondent's determination. The petitioner has presented copious, detailed, and extensive evidence consisting of testimony and a large quantity of documentary proof. The respondent did not present any countervailing evidence. We have observed before that determination *231 of the reasonable needs of a business for capital is, in the first place, "a task for the officers and directors of the corporation. What is reasonable in one situation may be unreasonable in a different context of facts." Crawford County Printing & Publishing Co., 17 T.C. 1404, 1414. In this proceeding the evidence shows that petitioner legitimately plowed its earnings back into the business for uses which it contemplated would, in the near future, require a back-log of cash, and which would otherwise require resort to borrowing and the employment of credit. The evidence shows that resort to the method of accumulating earnings was done properly and did not involve abuse of the fiscal policy involved, which abuse section 102 of the Code was intended to thwart. The following are the chief needs for which petitioner accumulated earnings and profits during 1946: Petitioner's officers validly believed that it would require, on the basis of a conservative estimate, cash funds to cover two months' operating expenses in the amount of roughly $250,000. In J. L. Goodman Furniture Co., 11 T.C. 530, 535, we concluded, under the facts of that case, that a retention *232 of cash to cover one year's operating expenses was not unreasonable. The petitioner required funds to pay for and maintain inventories. The year 1946 was an abnormal one in the automobile industry and in petitioner's business. The post-war demand for automobiles exceeded greatly the supply. Prices of automobiles were 100 per cent higher in 1946 than in earlier years, for example, 1937. Petitioner had virtually no automobile inventory at the end of 1946. The estimate of petitioner's officers that $1,330,000 would be required for inventories was substantiated by the normal inventory requirements as established by the Cadillac Division of General Motors. The necessity for the retention of earnings with which to maintain normal as well as anticipated increases in inventories has been recognized as a valid reason for the retention of earnings. Lion Clothing Co., 8 T.C. 1181; J. L. Goodman Furniture Co., supra. In addition, the Cadillac Division had given notice in July, 1946, that the minimum net working capital requirements would be increased in the very near future by more than 25 per cent, and, consequently, petitioner's officers anticipated with good cause *233 that the new working capital requirements would exceed $1,244,000. They could not jeopardize petitioner's valuable franchises by being in a position in which petitioner could not meet the anticipated increased requirements. As matters developed, the minimum requirements fixed under the supplemental agreements of May 7, 1947 required petitioner to maintain a minimum of $1,420,965 as net working capital retroactively to January 1, 1947, which was about $180,000 more than had been estimated in July, 1946. Without elaboration, we point out that petitioner's officers adopted a legitimate business policy of retaining earnings to carry conditional sales contracts; they concluded, properly and in good faith, that petitioner should retain earnings to provide, construct, and equip a new Cadillac agency at the proposed new Wilshire-Ardmore building, and to replace worn out capital assets - mechanical equipment and machinery. Cf. General Smelting Co., 4 T.C. 313; and The Universal Steel Co., 5 T.C. 627. This Court has often recognized the fact that a taxpayer is not to be penalized and condemned because, for reasons beyond its control, it was unable to comply and *234 execute a program of expansion which it had honestly and in good faith contemplated and planned. It is clearly proved that the earnings and profits which the petitioner accumulated were not beyond the reasonable needs of its business. The respondent's determination is reversed. In Docket No. 26663, Don Lee, Incorporated, petitioner claims it has made overpayment of income tax for 1946. Therefore, recomputation under Rule 50 is necessary. Decision will be entered under Rule 50 in Docket No. 26663. Decision will be entered for the petitioner in Docket No. 26662. Footnotes
*. The status of the earned surplus account is not in dispute. A reconciliation of surplus has not been offered by the parties and the respondent has not offered the petitioner's income tax returns for any year prior to 1946.↩
*. Exclusive of claim against the Estate of Donald Musgrave Lee.↩